

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**UNITED STATES OF AMERICA,**

*Ex rel Ari Lawrence,*
*Relator-Plaintiff,*

v.

**HUNTINGTON INGALLS INDUSTRIES, INC.,**

**HUNTINGTON INGALLS INCORPORATED,**

**NORTHROP GRUMMAN CORPORATION,**

   Defendants.

*UNDER SEAL*
*PURSUANT TO 31*
*U.S.C. §3730(b)(2)*

Case No. 3:16cv 576 J 398d6

**Do Not Place In Press Box or
Enter On Publicly Accessible
System (PACER)**

<u>**FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

   On behalf of the United States of America, Relator-Plaintiff, Ari Lawrence (hereinafter "Relator"), by counsel, files this *qui tam* Complaint against Huntington Ingalls Industries, Inc. ("Huntington Ingalls"), Huntington Ingalls Incorporated ("Huntington Ingalls Incorporated") and Northrop Grumman Corporation ("Northrop Grumman") (herein collectively referred to as "Defendants"), and alleges as follows:

**I.   <u>INTRODUCTION</u>**

   1.   This is an action to recover treble damages and civil penalties in excess of $100 million on behalf of the United States of America from Defendants for knowingly and/or recklessly presenting false claims to the United States government in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq. Defendants falsified testing and certifications on multi-billion dollar submarine contracts, which induced the Government to pay

TRA-36638
$400

1

S-1

Defendants in-full for submarines with dangerous defects that put American lives at risk. More specifically, as to critical components of the submarines, including the application of the sound-dampening exterior hull coating, the Defendants: 1) failed to develop a first particle testing procedure; 2) failed to produce sample test articles; 3) failed to perform mechanical and physical property tests on said samples; 4) failed to demonstrate processing ability; 5) failed to receive first article qualification from the applicable technical authority prior to commencement of work; 6) failed to develop and maintain a training program that ensured that all personnel were properly educated and certified; and 7) failed to develop and maintain internal processing handling and quality inspection procedures. Nevertheless, the Defendants certified in their payment applications that all such certifications and procedures had been met.

## II.     PARTIES, JURISDICTION AND VENUE

2.     Prior to the filing of this Complaint, and required by the FCA, 31 U.S.C. § 3730(b)(2), Relator has previously provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida, a Sworn Disclosure Statement containing all material evidence and information related to this complaint. The Sworn Disclosure Statement is supported by material evidence known to the Relator establishing the existence of Defendants' false claims. Because the Sworn Disclosure Statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and the United States Attorney in their capacity of potential co-counsel in the litigation, the Relator understands this disclosure to be Confidential.

3.     The Relator, Ari Lawrence, is a citizen of the United States and a resident of the Commonwealth of Virginia. He is a Senior Engineer in the Submarine Engineering Department

with technical expertise related to the construction of Virginia-class attack submarines at the Huntington Ingalls Newport News Shipbuilding ("NNS") facility in Virginia.

4.      Northrop Grumman is an aerospace and defense technology company and is the fifth largest defense contractor in the world as of 2015. Northrop Grumman employs over 68,000 people worldwide. The company is headquartered in Falls Church, Virginia. For 2015, the company's net earnings totaled approximately Two Billion Dollars ($2,000,000,000.00). Northrop Grumman has operations throughout the United States and the world and further has offices located at 5401 West Kennedy Boulevard, #1000, Tampa, Florida; 4500 NW 27th Avenue, #D, Gainesville, Florida; and 5000 U.S. 1, Saint Augustine, Florida. On November 7, 2001, Northrop Grumman entered into an agreement to purchase Newport News Shipbuilding for a total of $2.6 billon, which created Northrop Grumman Newport News. In January of 2008, Northrop Grumman realigned it two shipbuilding sectors (Northrop Grumman Newport News and Gulf Coast-based Northrop Grumman Ship Systems) to create a single sector Northrop Grumman Shipbuilding. On March 31, 2011, Northrop Grumman Shipbuilding spun off its shipbuilding division to create Huntington Ingalls Industries.

5.      Huntington Ingalls Industries, Inc. ("Huntington Ingalls") is a corporation organized and existing under the general corporation law of the state of Delaware. Huntington Ingalls is America's largest military shipbuilding company with its headquarters in Newport News, Virginia. Huntington Ingalls employs approximately 37,000 people operating both domestically and internationally. Huntington Ingalls also performs work in Pascagoula, Mississippi; Virginia Beach, Virginia; Broomsfield, Colorado; Panama City, Florida; Houston, Texas; and San Diego, California and also has employees in various places throughout the nation, including Groton, Connecticut; Kingston, Rhode Island; and at a subsidiary company

(Universal Pegasus International) in Tampa, Florida. Many of the acts complained of herein occurred both prior to and after the spin-off of Huntington Ingalls from Northrop Grumman.

6.     Huntington Ingalls Incorporated is a Virginia Corporation. Furthermore, Huntington Ingalls Incorporated has filed a fictitious name statement with the Virginia State Corporation Commission indicating that it also operates under the name of Newport News Shipbuilding, a Tenneco Company. Huntington Ingalls Industries publicly advertises that Newport News Shipbuilding is a division of Huntington Ingalls Industries. As a result, upon information and belief, Huntington Ingalls Incorporated is a division and wholly-owned subsidiary of Huntington Ingalls Industries, Inc.

7.     The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. §3732, and otherwise have jurisdiction under 28 U.S.C. §§1331 and 1345. At all times relevant hereto, the Defendants regularly conducted substantial business in Florida and maintained and operated sales division offices in this District and Division. Accordingly, the Defendants are subject to personal jurisdiction in this District. Venue is appropriate in the Middle District of Florida pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b)(1) and (2).

8.     Section 3732(a) of the FCA provides that "any action under Section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by Section 3729 occurred." The acts complained of herein occurred throughout the United States, the State of Florida and within the geographic area encompassed within the Jacksonville Division of the United States District Court for the Middle District of Florida.

9.     Relator began employment with Huntington Ingalls' predecessor (Northrop Grumman Corporation) in October of 2001 as an Engineering Associate I . He has continued with his employer to the current date and is currently a Senior Engineer. He has direct knowledge of the facts herein and is the original source of the same. While he is unaware of any of the counts, fraud allegations and/or any of the acts described herein in violation of 31 U.S.C §3729 having been publicly disclosed as contemplated under 31 U.S.C. §3730(d)(4)(B), he has made voluntary disclosure of substantially all evidence and information in his possession to authorities responsible for investigating these allegations prior to filing this Complaint and is an original source of the information contained in the Complaint.

10.     Under the FCA, this Complaint is to be filed *in camera* and remain under seal until the Court orders otherwise.

III.   **FACTS COMMON TO ALL COUNTS**

**A.     Introduction**

11.     Newport News Shipbuilding (NNS) is a division of Huntington Ingalls located in Newport News, Virginia. Virginia-class submarines are built through an arrangement between Huntington Ingalls, in Newport News, Virginia and General Dynamics Electric Boat in Groton, Connecticut (hereinafter referred to as "Electric Boat"). Under the arrangement, the Huntington Ingalls facility in Newport News builds the stern, habitability and machinery spaces, torpedo room, sail and bow; whereas, Electric Boat builds the engine room and control room. Huntington Ingalls and Electric Boat alternate work on the reactor plant, as well as the final assembly, testing, outfit and delivery of the boats.

12.     The Relator was, and continues to be as of the date of the filing of this suit, the Subject Matter Expert (SME) and the "System Owner" for the system called a High Frequency

Chin Array ("Chin Array"), which is a sonar system used for mine detection on the Virginia-class submarines. The "Chin Array," which is a subject of the false claims herein and described in the following paragraph, is always installed by Huntington Ingalls.

13.    In the course of his employment, Relator discovered that certain departments at the Huntington Ingalls facility did not have appropriate and required qualifications to apply a certain two-part adhesive surface coating ("TPAC") to the exterior of the Chin Array. The TPAC is the primary binding agent that is utilized to attach the Virginia-class submarines' stealth exterior sound absorbing materials to the entire submarine hull. As more fully described below, when Relator pressed for documentation validating the required certifications and pre-qualifications, individuals at NNS falsified test reports and equipment certifications in an attempt to conceal the fact that they were not qualified to apply the TPAC. In addition, the NNS Quality Assurance ("QA") Department performed a "Pulse" Audit of the departments involved in applying the TPAC and immediately issued a Serious Deficiency Report (SDR) to the Submarine Engineering Department ("SUBE") and Trade Management noting that they did not have the proper qualifications, documentation, or training required to perform the work. Moreover, an independent Director at NNS also identified the deficiencies and voiced the Navy's growing concerns over the poor quality of work occurring at NNS with respect to the TPAC.

14.    Notwithstanding Relator's requests, NNS took no steps to cease utilizing the TPAC improperly, ignoring the objections of SUBE and QA, and exerted pressure on employees to improperly certify and accept the work performed.

15.    The knowing failure of NNS to have certified and pre-qualified applicators is a violation of the Navy's design specifications and contractual requirements; and NNS took

deliberate efforts to conceal the lack of qualifications, procedures, and training as required by the Navy.

16.     More importantly, in the process of investigating these serious deficiencies, Relator discovered that Huntington Ingalls had never obtained proper qualifications and certifications for the use of TPAC on the Virginia-class submarines for *any* applications. These qualifications and certifications are critical to ensure that the personnel used to mix and apply the TPAC are properly qualified and that the procedures are performed correctly

17.     Since the commencement of the program, as a consequence of NNS' failures to follow the Navy's contracting requirements and specifications as alleged above, Virginia-class submarines have been plagued with serious adhesive failures of the exterior hull coating due to the failure of the binding agent and the problem with the TPAC has continued to this date, including failures of the exterior coating on the recently sea-trialed USS John Warner.

18.     The failure of this exterior sound-absorbing material jeopardizes the safety of the submarines, and makes the submarine easier to detect by those who would seek to harm the United States, thereby endangering the crew and national security. The failure of the sound-absorbing material is a direct result of NNS' failure to adhere to proper Navy contract specifications and a direct effort to conceal that lack of qualifications and certifications required by the Navy.

**B.     Background of Virginia-Class Submarines**

19.     In 1998, the United States Navy awarded a $4.2 billion dollar contract for the construction of the first four boats of the class. USS Virginia (SSN-774) was the first of these. On December 22, 2008, the United States Navy awarded a $14 billion dollar contract to Electric Boat and Huntington Ingalls' predecessor (Northrop Grumman) for eight more Virginia-class submarines. The contract called for the delivery of one submarine in each fiscal year of 2009 and

2010 and two submarines in each fiscal year 2011, 2012 and 2013. In December of 2010, the United States Congress passed a defense authorization bill that expanded production to two submarines per year, which resumed on September 2, 2011, with the commencement of construction of the USS Washington (SSN-787).

20.    The Virginia-class submarines have been constructed in "Blocks." These Blocks are summarized in Table I below that includes the status of the construction and/or delivery of the vessels and further includes the internal designation or ship number used by Huntington Ingalls in Newport News.

Table I – Virginia-Class Submarine Construction

| Block | Name & Hull # | Newport News Ship Number | Status | Final Delivery By | Contract Amount | Contract Number |
|-------|---------------|--------------------------|--------|-------------------|-----------------|-----------------|
| I | USS Virginia (SSN-774) | | Commissioned and in service | Electric Boat | | |
| I | USS Texas (SSN-775) | | Commissioned and in service | Newport News Shipbuilding | | |
| I | USS Hawaii (SSN-776) | | Commissioned and in service | Electric Boat | | |
| I | USS North Carolina (SSN-777) | | Commissioned and in service | Newport News Shipbuilding | | |
| II | USS New Hampshire (SSN-778) | | Commissioned and in service | Electric Boat | | |
| II | USS New Mexico (SSN-779) | | Commissioned and in service | Huntington Ingalls | | |
| II | USS Missouri (SSN-780) | | Commissioned and in service | Electric Boat | | |

| II | USS California (SSN-781) | | Commissioned and in service | Huntington Ingalls | | |
|---|---|---|---|---|---|---|
| II | USS Mississippi (SSN-782) | | Commissioned and in service | Electric Boat | | |
| II | USS Minnesota (SSN-783) | | Commissioned and in service | Huntington Ingalls | | |
| III | USS North Dakota (SSN-784) | NN 669 | Commissioned Delivered Aug.29,2014 | Electric Boat | | |
| III | USS John Warner (SSN-785) | NN 670 | Commissioned and in service on P.S.A | Huntington Ingalls | | |
| III | [Illinois] SSN-786 | NN 671 | Christened in 10/15 | Electric Boat | | |
| III | [Washington] SSN-787 | NN 672 | Christened in 03/16 | Huntington Ingalls | | |
| III | [Colorado] SSN-788 | NN 673 | Under Construction | Electric Boat | | |
| III | [Indiana] SSN-789 | NN 674 | Under Construction | Huntington Ingalls | | |
| III | [South Dakota] SSN-790 | NN 675 | Under Construction | Electric Boat | | |
| III | [Delaware] SSN-791 | NN 677 | Under Construction | Huntington Ingalls | | |
| IV | [Vermont] SSN-792 | | Under Construction | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [Oregon] SSN-793 | | Under Construction | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [Montana] SSN-794 | | On order | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |

| IV | [Hyman G. Rickover] SSN-795 | | On order | Electric Boat | $17,650,394,416 | N0002412C2115 |
|----|------|---|------|------|------|------|
| IV | [New Jersey] SSN-796 | | On order | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Iowa] SSN-797 | | On order | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [Massachusetts] | | On order | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Idaho] SSN-799 | | On order | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | SSN-800 | | On order | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Utah] SSN- | | On order | Electric Boat | $17,650,394,416 | N0002412C2115 |

21.     The ten Virginia-class boats shown in Table 1 for the period of FY2014-FY2018 (referred to as the Block IV boats) are being procured under a multiyear procurement (MYP) contract that was approved by Congress as part of its action on the FY2013 budget, and awarded by the Navy on April 28, 2014. The award identification number was N0002412C2115 and the base and exercise options value of the contract was $17,650,394,416. The eight Virginia-class boats procured in FY 2009-FY2013 (Block III boats) were procured under a previous MYP contract, and the five Virginia-class boats procured in FY2004-FY2008 (Block II boats) were procured under a still-earlier MYP contract. The four boats procured in FY1998-FY2002 (the Block I boats) were procured under a block buy contract, which is an arrangement somewhat similar to an MYP contract. The boat procured in FY2003 fell between the FY1998-FY2002 block buy contract and the FY2004-FY2008 MYP arrangement, and was contracted for separately.

### C.     Submarine Hull Coating Problems

22.     Since the inception of the program, the Virginia-class submarines have been plagued with problems with their exterior hull coating system.

23.     The hulls of the Virginia-class submarines contain a specialized exterior hull coating that is designed to be "anechoic," which means that the coating absorbs the sound waves of active sonar so they do not bounce back to the ship or submarine emitting the signal, thus evading sonar detection. To the extent that this exterior hull coating fails, this imperils an underway submarine by making it easier to detect by sonar location.

24.     The exterior hull coating is applied to the submarine by Defendants with a two-part adhesive coating as discussed above, the "TPAC."

25.     The United States Navy started reporting problems with the separation of the exterior coating in 2007 on the USS Virginia, which was the first submarine of the class. At that time, it was clear that there was a de-bonding problem with the exterior coating. In fact, on the USS Virginia, and subsequently delivered Virginia-class submarines, the exterior coatings tore off submarines while underway, often in large sections up to hundreds of square feet. Furthermore, the Pentagon's top weapons tester at the Office of the Director, Operational Test & Evaluation (DOT&E) released a scathing report on June 30, 2010 on the Virginia-class submarine's tendency to shed its sound-dampening hull coating.

26.     On January 20, 2010, the Daily Press, a Newport News, Virginia-based newspaper reported that the coating that had peeled off in the earlier submarines in large swaths appeared to be adhering better to new boats, as indicated by a top Navy procurement official. The report indicated that after the Navy found that the sonar absorbing coating had major adhesive failures on three of the first four submarines in its class, they initiated an investigation to determine the cause of the problem and how to fix it. The newspaper article further quoted Vice Admiral Kevin M. McCoy, Commander of Naval Sea Systems Command, stating that "we think, for the most part, those issues are behind us." McCoy further stated that the Navy's

investigation revealed "no single smoking gun" and that he was very confident going forward that the Navy's submarine would retain its exterior coating that is necessary to keep the ship silent and stealthy. The article further indicated that effectiveness of the submarines was being fixed during normal dry-dock maintenance.

27.     Despite the Navy's public assurances, evidence indicates that the exterior coatings of the Virginia-class submarines have continued to fail since that date. One observer published an article on September 6, 2010 entitled "A Virginia Class – When Does Hull Coating Separation Endanger the Boat?" This individual, Craig Hooper, referenced the DOT&E report and further quoted Allen Baribeau, with Naval Sea Systems Command, in an interview from Inside the Navy, wherein he stated "[t]he de-bonding issue has been aggressively pursued since its recognition in 2006," the statement reads, "the problem was largely due to immature application processes, which have been corrected on late ships. Because of the parallel construction process, [the hull treatment] was applied to several ships before the first at-sea testing of Virginia. The program office continues to monitor the performance of all ships and pursue improvement."

28.     Mr. Hooper went on to observe that based upon the pictures available, it appeared that every Virginia-class submarine was suffering from an "ugly tendency to shed their hull treatment" and questioned whether this could affect survivability. The article included recent photographs of the USS Virginia and USS Hawaii showing large sections of their surface treatment ripped away.

29.     In fact, these same problems continue today as evidenced by the failure of the exterior coating system on the recent sea trial of the USS John Warner in June of 2015.

### D.     The High Frequency Chin Array

30.     As previously discussed, the Virginia-class submarines are built in a cooperative agreement by Electric Boat and Huntington Ingalls. The two shipyards construct different sections of the boat and then alternate for the final assembly and delivery of the boats; Huntington Ingalls will deliver one boat and Electric Boat will deliver the next.

31.     Each submarine has a High Frequency Chin Array (the "Chin Array") that is installed directly under the bow so as to give an unobstructed acoustic view in front of and below the submarine. Huntington Ingalls installs the Chin Array on all Virginia-class submarines regardless of whether the boat is delivered by Huntington Ingalls or Electric Boat. The Chin Array is a passive high resolution sonar system used for mine detection.

32.     The Chin Array's composite fairing cap and tail fairings have historically been covered with a neoprene boot for protection. However, due to its location, this boot is vulnerable to damage during normal ship operations from debris impacts. As a result, if the neoprene boot is damaged, even in small localized areas, it can come adrift in its entirety while underway and potentially damage other areas of the hull. As a result, the decision was made to change the design from a molded neoprene boot that is adhered to the fairings using epoxy, to a casted/pourable TPAC material utilized as a boot.

33.     The Chin Array components are designated as "buy" parts that are subject to government competitive bid requirements in addition to requirements that the parts be procured only from qualified suppliers. Pursuant to Huntington Ingalls's contract with the Navy, the shipyard is contracted to only install compliant parts on the hull. As discussed below, certain groups within the Huntington Ingalls organization sought instead to install the TPAC boot to the procured fairings themselves, claiming it would lower acquisition costs. Further, these groups maintained that Huntington Ingalls was fully qualified to pour the TPAC boot and that it would

be a waste of money for Huntington Ingalls to pay a supplier to become qualified to do this work.

34.      There were two NNS Departments that were primarily involved in advocating pouring the boots in-house. Within Department E46 is the Special Hull Treatment (SHT) and Mold In Place (MIP) group. E46 acts as a technical support group to Department X32, which is the Trade Department that installs MIP and SHT to the hull. E46 should maintain all NNS documentation, certifications, procedures and training programs related to SHT/MIP for X32. Subsequently, all X32 trades shall hold and maintain certifications to apply SHT/MIP on hulls. Department E46 is not a functional engineering group at NNS. As such, they do not hold technical authority to deviate from the Class Design requirements, nor are they authorized to direct trades to perform work. Department E46 is akin to a research and development team, whereas SUBE holds the functional engineering disciplines (Hull Structures, Mechanical, Electrical, and Submarine Piping) that hold all technical authority as the drawing and system owners.

35.      The design change from a neoprene boot to a TPAC boot came in the middle of the Block III contract with the Chin Array fairing supplier. In order to mitigate out of scope design change fees, both NNS and Electric Boat agreed that Electric Boat trades (who are presumably qualified) should install the TPAC boots to Block III hulls 673D thru 677D. Then the Design change can be implemented on the Block IV hulls, which had not yet started, so that qualified suppliers could competitively bid for the work. This scenario was included in the Virginia-class Submarine Block IV technical baseline design that was agreed upon between the United States Navy, Electric Boat, and NNS, and believed to be the most cost effective method.

36.    New construction work must be performed in accordance with the applicable Drawings, Specifications, Part Number requirements, and the Purchase Order. For out of scope work, Trades or "Tiger Teams" (installation and repair trades at various naval installations worldwide who perform emergent repair work) must perform work in accordance with an Engineering Report (ER).

37.    The first instances of Neoprene boot failures occurred while the ships were in service, therefore replacement TPAC boots were installed by Tiger Teams via ER. Accordingly, the 673D thru 677D (Block III) TPAC Electric Boat trade installation requirements were to be in accordance with:

| |
|---|
| FMR# 400243 – Navy Authorization and Funding to perform the work and Authorization Contract No. N00024-09-C-2104 and Contract Ch. No. N0684.0861A |
| ERH433-2016C13 Rev. A – Engineering Authorization and requirements to perform the work |
| H576-1501 MIP/SHT TPAC Processing manual and requirements (mixing etc.)[1] |
| EB 4520 TPAC Qualification and Material requirements |
| NAVSEA 690-6726587 TPAC Qualification and Material requirements |
| H681-1202 HFCA DWG |

38.    Going forward for the 678D (Block IV), All Future Ships (AFS) New Construction Chin Array Design TPAC installation requirements are to be in accordance with:

---

[1] H576-1501 is a shipbuilder only document. Suppliers cannot perform work from this document.

| |
|---|
| EB Spec 4343 – Chin Array Procurement Specification |
| H681-1202 Chin Array Piece Part Drawing Detail and Class Design Requirements |
| P/N H6811202-A7 thru A9 – Part Number contractual requirements and associated standard clauses and coded notes |
| EB 4520 - TPAC Qualification and Material requirements |
| NAVSEA 690-6726587 – TPAC Qualification and Material requirements |

39.     Matt Shaffer from NNS Department E46 approached the Chin Array System owner (Relator) and requested the opportunity to share this work with Electric Boat and install the TPAC boot in-house to finish the Block III boats. Mr. Shaffer stated that NNS could install a higher quality TPAC boot than Electric Boat at a lower cost than any supplier. Mr. Shaffer stated that NNS (E46/X32) was fully qualified for all invoked TPAC requirements for the SHT/MIP Program in accordance with H576-1501. The Relator, however, advised Mr. Shaffer that NNS was not qualified to meet the extensive New Construction Chin Array requirements in accordance with EB Spec 4343 as these requirements are far more stringent than the SHT/MIP requirements. He further advised Mr. Shaffer that the company would expend significant expense attempting to become qualified, instead of using one of several other suppliers who were already qualified to perform the work. The relator reluctantly granted E46/X32 approval to install the TPAC boots to Block III hulls 675D and 677D only, via ER, with the stipulation that they must be taught how to do the work from Electric Boat on hulls 673D and 674D, and SUBE-Department E12 held final approval authority of the finished parts prior to installation.

40.     The H576-1501 MIP/SHT manual, which as noted in paragraph 36 was a requirement for the Block III replacement TPAC boots, includes the following for all shipboard TPAC Applications:

- **EB 4520 and NAVSEA 690-6726587 – TPAC Qualification and Material requirements:**
  - NNS First Article Qualifications
  - NNS Engineering Approved Procedures for processing TPAC

    o  A NNS Quality Inspection Program for all phases of TPAC Processing in accordance w/ MIL-I, MIL-Q, or ISO standards

Table II – EB Spec 4520 – TPAC Incompressible Wedge Manufacturing

| |
|---|
| First Article Testing and Qualifications |
| Process and Inspection Procedures/System IAW |
| MIL-I Recurring Quality Assurance Inspections |

- **An NNS Training program that provides Trade / Operator Certifications to perform any/all phases of MIP/SHT and TPAC processing and installation work:**

Table III – VCS DWG H576-1501 – Special Hull Treatment Installation Procedure

| |
|---|
| Section 8.3.1.6 Material Inspection in Accordance with NAVSEA DWG 690- |
|     Visual Inspection per Table 8.2 |
|     Material Verification per Table 8.2 |
|     Certification Records for documentation per NAVSEA DWG 690-6726597 |
| Section 8.3.1.11 TPAC Bonded Shapes |
|     Visual Inspection for Major/Minor Defect Criteria in Table 8-4 |
|     Dimensional requirements as specified by piece part DWG |
|     Material verification |
|     Shore D Hardness documentation |
|     In Process material samples tested for acceptance in accordance w/ NAVSEA DWG 690-6726597 |
|     Certification Records for documentation in accordance with EB Spec |
|     Traceability documentation for raw material batch to finished part |
| Section 9.0 Training |
|     Official Training Records shall be kept |
|     SAT rating required prior to performing any work |
|     Qualified personnel shall be issued a certification card which identifies MIP/SHT training |

- **EB Spec 4343 – Chin Array Procurement Specifications:**

Table IV – EB Spec 4343 – In Chin Array Procurement

| Approved Technical Documents Required Prior to Production |
|---|
| Section 3.2.1 & 3.11.1.2 Mold and TPAC Installation DWGs |
| Section 3.2.4.1 TPAC First Article Test Procedure |
| Section 3.2.4.1 TPAC First Article Test Report |
| Section 3.2.5 TPAC Installation Procedures |
| Section 3.5 Tool String Matrix |
| Section 3.5 & 3.11.1.3 Component Design Report for Special Tooling (molds, etc.) |
| Section 3.8.4 Alternate Material Use Requests |
| Section 3.11.1.1 Process Specifications |
| Section 3.11.1.3 Special Tool DWGs |
| Section 3.11.1.4 Dimensional Inspection Procedures |
| Section 3.11.1.4 Visual Inspection Procedure |
| Section 3.11.1.4 Ultrasound Inspection and Equipment Calibration Procedures |
| Section 3.11.1.4 Surface Finish Inspection Procedures |
| Section 3.11.1.4 Acceptance and Rejection Criteria Procedures |
| Section 3.11.1.4 Repair and Rework Procedures |
| Section 3.11.1.4 Ultrasound Equipment Procedures |
| Recurring Quality Assurance Certification and Test Reports |
| Section 4.3.5.4 Material Test Documentation |
| Section 4.3.4.5 Material Storage Life Certification |
| Section 4.3.7 Inspection Reports |
| Visual Inspection/Workmanship Report |
| Dimensional Inspection Report |
| UT Result Report and Map |
| Shore D Hardness Measurements and Map |
| Mass Ratio Report |

41.     The Relator initially indicated to Departments E46 and X32 that the TPAC needed to be applied in accordance with the Chin Array Procurement Specification EB Spec. 4343. This specification includes the requirements discussed above, such as the "first article" testing and approval, engineering/customer approved procedures, and a quality inspection program. These specifications were in place to ensure a product that conformed to all contractual requirements. Among other things, the specifications required TPAC first article testing, such that both personnel and equipment were to undergo testing and certification prior to being permitted to install the TPAC on the Chin Array. Also, samples were required to be produced

and tested prior to obtaining certification. This is an extensive and time-consuming process as it would require all equipment and application personnel to be certified to apply the materials correctly before any work could be commenced, including the Paragraph 39 summary of pertinent TPAC EP Spec 4343 requirements that applied to the Chin Array.

42.     One of the Relator's co-workers, David Perreault from Department E12, discovered that E46 had used the ERH433-2016C13 to create a time and material charge against hull 672D, then procured significant amounts of raw materials and a TPAC processor. NNS was not authorized to charge time or resources to hull 672D, as funding for that hull was already authorized by the Navy under an UPSA (modification to the 673D - 677D FMR without budget constraints) and directed by Engineering to be performed by a qualified supplier that was already under contract.

43.     Mr. Perreault submitted a "false charging" complaint to the "OpenLine" of Newport News Shipbuilding. Huntington Ingalls advertises that its OpenLine offers "an anonymous and confidential means to voice concerns or report a suspected violation of our Code of Ethics and Business Conduct without fear of retaliation or coercion." Huntington Ingalls further advertises that "[i]ndividuals who witness or suspect that anyone is active against our Code of Ethics and Business Conduct should raise the concern immediately with their management, Human Resources, Business Conduct Officer (BCO) or the OpenLine." Mr. Perreault's OpenLine complaint was forwarded directly to the Human Resources Department of Department E46 (which is the group that committed fraud), instead of forwarding the complaint to higher management outside of the department.

44.     As a result of Mr. Perreault's call to the OpenLine, a meeting was scheduled with the Human Resources representative for Department E46 and the Human Resources

representative for the Relator's department (E12), Submarine Engineering, at which point the Relator and Mr. Perreault were told that Departments E46 and X32 had done nothing improper. Amarita Kim was the HR Representative who blocked any action being taken against Department E46 for False Charging, and insisted that nothing was done improperly.

45. Matt Shaffer from Department E46, working in conjunction with Department X32 trades, poured the first NNS TPAC boot designated for hull 677D in April 2015 on a Chin Array fairing cap. Scott Mader is a Supervisor in Department E46 and is Matt Shaffer's immediate superior. Mr. Mader and Mr. Shaffer advised trade management that the part was fabricated and inspected in accordance with Virginia-class Submarine design and ER requirements and was satisfactory for installation. However, pursuant to applicable requirements and ERs, the part required inspection and acceptance by Relator's group—SUBE-Department E12—prior to installation. Upon on-site review of the part, SUBE noted unacceptable defects, adhesion failures, and foreign material. All applicable Chin Array requirements maintain that no defect greater than .25" shall exist without repair and SUBE approval. This particular boot had a Major Defect in excess of 12 feet long across its entire leading edge.

46. Mr. Shaffer stated that he directed the area to be repaired without seeking SUBE approval, and believed the repair to be satisfactory. Mr. Shaffer, Departments E46, and X32 made numerous attempts to conceal the true as-built condition of the part by sanding over the areas such that an inspector could not see through the normally clear TPAC material. SUBE performed a more thorough inspection and documented the numerous defects in multiple ERs directing Departments E46 and X32 to perform extensive corrective actions.

47. At the same time the issues between Department E46 and E12 (the Relator's Department) occurred, Department E12 Management authored and submitted a requisition

request for the Relator to be promoted from an E3 Senior Engineer to an E4 Project Engineer based on his 15 years of experience, Master's Degree, and repeated exemplary service and performance ratings. The requisition/promotion request was approved by the Director of Submarine Engineering as well as the Vice President of Engineering at Newport News Shipbuilding. However, when the promotion was submitted to HR to create a requisition, the promotion was denied by Amarita Kim.

48.     Due to the condition and poor quality of the first Fairing Cap with the TPAC boot, SUBE–Department E12 requested that E46 provide all standard processes and inspection documentation used when pouring the TPAC material for any/all other applications on the ship. Departments E46 and X32 were unable to produce any NNS created procedures or documentation.

49.     The equipment used to mix the TPAC is also required to hold first article qualifications and approval prior to use pursuant to IAW ED Spec 5105. This Equipment Qualification is tied to the equipment manufacturer and the serial number of the machine. The use of a qualified machine does not grant the operator "qualification" to mix the material in that machine. Department E46 stated that a Qualified Machine would be used to mix and pour the TPAC on the Fairing Cap. Therefore, E12 also requested that E46 provide a photograph of the Label Plate that is permanently affixed to the TPAC Processor by the manufacturer typically by rivets or tack welds. A Label Plate includes the Manufacturers Name, Purchase Order, Part Number, and most importantly, the Serial Number of the machine and provides quality assurance that the equipment used met applicable specifications and requirements. Matt Shaffer, of Department E46, used a label maker to produce a sticker that read "Serial # 5803," affixed the sticker to the side of the machine, and took a photograph of the sticker and submitted it to

Engineering as verification that a qualified machine was used. This was clearly an attempt to fraudulently submit false Objective Quality Evidence (OQE) to demonstrate that a Qualified Machine was used on the part, when, in fact, it was not.

50.    Departments E46 and X32 then claimed that the Fairing Cap only had to meet the requirements specified in the H576-1501 SHT/MIP installation manual, and did not have to meet any of the invoked Chin Array requirements, such as EB Spec 4343 and the Chin Array Drawing. Although SUBE disagreed with this claim, the Relator investigated the VCS DWG H576-1501 specifications to determine what that document required for MIP/SHT. The VCS DWG H576-1501 is a specification of over 500 pages with dozens of invoked qualification specifications for the various material types specified, and like EB Procurement Specification 4343, required first article qualification, Engineering approved processes and inspection procedures, as well as a thorough training and certification program for the trades and operators.

51.    SUBE then issued a follow up ER stating that the Fairing Cap with TPAC boot poured by E46/X32 for Hull 677D did not meet the requirements of EB Spec 4343, the Chin Array DWG H681-1202, ERH433-2016C13, H576-1501, nor the FMR, and was now deemed Technically Unacceptable for use on a Virginia Class Submarine. Engineering ordered the TPAC boot removed from the part in its entirety.

52.    At this time, VCS Trade Management along with E46 exerted significant pressure on the Relator and the SUBE Program to accept the part as-is despite its deficient condition. Trade Management also refused to release the part to a courier so that the part could be shipped to a sub-contractor to have the boot removed.

53.    The Relator had a heated discussion with his direct manager in front of numerous NNS Carrier, Submarine, and Supplier Quality Engineers over the Relator's refusal to accept the

part as-is, and refusal to provide technical support to E46 and aid them in becoming successful at pouring TPAC to HFCA parts. The Relator's Manager suggested the issue was merely a personality conflict between Matt Shaffer and the Relator, despite evidence of fraud, violation of every requirement specified for the part, and ultimately the blatantly defective as-built condition of the parts produced.

54.     Immediately after the aforesaid discussion, Relator became visibly upset in an NNS Parking lot while describing the events to his wife (also an NNS Employee), which prompted NNS Security to approach the couple. The Relator explained the situation to NNS security, who concurred that the issue needed to be elevated to NNS Upper Management immediately. NNS Security recommended providing a written statement in their Security Report detailing the pressures by Trade and Engineering Management to accept the part and install it on the boat. NNS Security stated the written report would be investigated by a different entity and likely be seen by NNS Executive Management.

55.     Unfortunately, the NNS Security Report, which is the second attempt at documenting and reporting unethical business conduct, was "investigated" by Amarita Kim in HR, who again dismissed any and all claims that wrong-doing had occurred in E46, Trade Management, and Engineering.

56.     Department E46 Management then sent an e-mail to SUBE stating E46's choice of E12 and the Relator to invoke EB Spec 4520's First Article Qualification requirement was "out of scope," therefore additional funding should be sought from the Government. Department E46 went on to claim that the Relator, E12, and SUBE were now adding "new requirements" for the Chin Array with a TPAC boot that E46 had not planned for, which significantly increased NNS' cost and extended the schedule to perform the work. The year before, however, Scott

23

Mader of Department E46 sent an email dated Dec. 10, 2014, that attempted to persuade the NNS Program Office (Tom Ward, Anna Yarashus, and David Vincent) to choose Department E46 to perform the work in lieu of a supplier to save costs. In the email, Mr. Mader stated that the TPAC installation on the Chin Array must be accomplished in accordance H576-1501 and EB Spec 4520, which requires First Article Qualification and approved procedures. Mr. Mader claimed that NNS Department E46 had already met all of the requirements of H576-1501 and EB Spec 4520, and that NNS would incur unnecessary additional costs to pay for a supplier to meet these requirements. This demonstrates that E46 knew of the requirements well in advance of the shift of the work from a qualified supplier to E46/X32, and despite E46's new claim, the requirements were not added scope that had afterwards been imposed on them by E12 and the Relator.

57.     Once it became apparent that E46/X32 did not hold even the bare-minimum qualification requirements for TPAC, the NNS Chief Engineer's Office ultimately persuaded Department E46 and X32 to perform First Article Testing in accordance with EB Spec 4520 and submit it to SUBE-Department E12 for Approval. EB Spec 4520 is applicable across all Submarine Programs (688 Class, SSN 21 Class, Ohio Class, and Virginia Class) for all TPAC applications and requires an entity seeking to perform that work to produce a sample of TPAC, provide all Objective Quality Evidence (OQE), perform an inspection of the sample, provide test results, and then develop processes and quality inspection procedures in accordance with MIL-I, prior to beginning production parts.

58.     On August 27, 2015, Department E46 submitted a First Article PowerPoint presentation to SUBE-Department E12 for approval. Upon review of the document, SUBE noted that it included a photograph of a TPAC sample that was the same photograph of a sample

previously submitted by a sub-contractor for qualification of their own TPAC Processor. When Department E12 requested to inspect the sample used for testing, Department E46 stated the sample had been thrown out. The Chief Engineer's Office deemed the 1st Article presentation adequate and pressed the Relator to accept the document and grant qualification to Department E46. The Relator refused and questioned Department E46 if they had any prior experience with performing First Article Testing, because the presentation did not follow the requirements of EB Spec 4520 and included test results very similar to a sub-contractor's first article submission. With the Chief Engineers Office and SUBE Department E12 Management as witnesses, Department E46 stated they had no prior experience performing First Article Qualification testing for Newport News Shipbuilding.

59.     The relevant VCS DWG H576-1501 specifications relating to the TPAC for special hull treatment procedures are summarized in Table III, *supra*. In addition, EB Spec 4520 applies to the use of the TPAC when used for Incompressible Wedge Manufacturing, which is summarized in Table V below.

Table V – EB Spec 4520 – TPAC Incompressible Wedge Manufacturing

| |
|---|
| First Article Testing and Qualifications |
| Process and Inspection Procedures/System IAW |
| MIL-I Recurring Quality Assurance Inspections |

**E. Use of TPAC as Adhesive for Exterior Coating to Virginia-Class Submarines**

60.     Although the utilization of the TPAC on the Chin Array was a new application of this product, Huntington Ingalls has also used the TPAC as an adhesive on the exterior of all of the Virginia-class submarines which they have delivered to the U.S. Navy as a means of bonding

the exterior sound-absorbing material to the submarine. This is the same material discussed earlier which has been sloughing off the Virginia-class submarines since their inception.

61.     In the process of reviewing VCS DWG H576-1501 specifications to determine if Departments E46 and X32 were applying the TPAC correctly to the Chin Array, Relator not only discovered that the Departments did not have proper qualifications for application of the TPAC to the Chin Array, but also discovered that the Departments also did not have proper qualification for the utilization of the TPAC as a bonding agent for the exterior hull coating of the submarines either. In other words, the Relator discovered that under VCS DWG H576-1501, Huntington Ingalls was required to have undergone appropriate training and obtain applicable certifications for the application of the TPAC to the exterior of the submarines to adhere the exterior sheathing, and that they had failed to do so. Consequently, Relator discovered that Huntington Ingalls has improperly adhered all of the exterior coatings to all of the Virginia-class submarines.

62.     This discovery of improperly-adhered exterior coatings occurred at the same August 28, 2015 meeting addressing the Qualification Presentation submitted to Engineering by Department E46 on behalf of Departments E46 and X32 to apply the TPAC to the Chin Array. The Chief Engineer's Office aggressively pressed the Relator, in front of the Relator's management, to accept the fraudulent presentation that was submitted and to grant Department E46 approval and qualification to apply the TPAC. The Relator refused to accept the presentation and challenged E46 on the content. As stated earlier, at this meeting, E46 admitted that they had no prior experience with First Article Procedures, Testing, or Qualifications at that time.

63.     The Relator subsequently discovered that all Special Hull Treatment/Mold in Place (SHT/MIP) materials require First Article Qualification prior to application on hull, approved material handling, application, and Quality Inspection Procedures, and an Applicator's Training and Certification Program.   As a result, the entire Newport News Shipbuilding SHT/MIP Program was not qualified to perform this work in accordance with H576-1501.

64.     Shortly after the August 28, 2015 meeting, the Relator was contacted by his counterpart at Electric Boat and asked why the Design Yard was advised by the Relator's management and E46 that the Relator was no longer "working" on the Chin Array and that any and all future discussions on the subject shall be with his management only. The Relator's Management then advised that the Chief Engineer's Office recommended that the Relator be demoted from his position as the System Expert with Technical Authority and sent to the yard to work on his "engineering rigor" because he was adhering to the applicable requirements too strictly.

65.     Specifically, in accordance with Specification H576-1501, Newport News Shipbuilding is required to develop a first article testing procedure, produce sample test articles, perform mechanical and physical property tests on said samples, demonstrate TPAC processing ability, and receive First Article Qualification from the Technical Authority prior to commencing production work on Virginia Class Submarines. Newport News Shipbuilding is also required to develop and maintain a training program that ensures that all of its personnel are educated and certified to properly mix and apply the TPAC to the exterior of Virginia Class Submarines. Further, Newport News Shipbuilding is required to develop and maintain internal processing, handling, and Quality Inspection Procedures for all phases of TPAC, as well as SHT/MIP production work. None of the aforesaid requirements as set forth by the Navy in accordance with

H576-1501 have been met. Newport News Shipbuilding, however, has certified in its payment applications that all SHT/MIP and TPAC has been applied in compliance with H576-1501.

66.     The TPAC, if utilized correctly, is highly effective, and upon information and belief, the exterior coatings of the Virginia-class submarines would not have failed if Huntington Ingalls had followed the applicable specification standards during the application process.

67.     Newport News Shipbuilding Quality Audit and Assessment Department (K93) that oversees internal Quality Assurance (QA) was directed to investigate and audit the SHT/MIP group for compliance. K93 chose to exercise a "Pulse Audit" of the E46/X32 trades while they performed a TPAC pour for VCS. Matt Shaffer from Department E46 attempted to block K93 from accessing the SHT/MIP shop by claiming K93 does not hold the necessary "need to know" and OSHA requirements. After being advised that neither E46 or Trade Management have the authority to block QA from performing internal audits, K93 witnessed X32 prepare, mix, and pour the TPAC material. Within hours of witnessing the SHT/MIP/TPAC operations, K93 issued a Serious Deficiency Report (SDR) dated August 21, 2015 for Department E46/X32's failure to adhere to the invoked specifications for the application of TPAC and found that:

> While preparing for a comprehensive audit of TPAC MIP/SHT processes, K93 Audit and Assessment noted that there is no objective quality evidence that specification required first article testing requirements have been performed for TPAC MIP/SHT production processes. In addition K93 was unable to determine if there were NNS engineering prepared procedures in place. It was found that a specification required inspection procedure had not been created. As such, K93 cannot conduct an audit until engineering has worked through a Plan of Action and Milestones (POA&M) to assure compliance with specification and local procedural requirements.

68.     In addition to the SDR issued by Department K93, Mike O'Donnell, a Director at

NNS, was also critical of Departments E46's and X32's ability to properly apply the TPAC. On

August 27, 2015, Mike O'Donnell wrote an email to Matthew Holding, Thomas Osbourne,

Willie Hayes, Scott Mader, John Zinskie, Ray Montgomery, Chandra McCulley-Hooker, and

Dave Bolcar. In this email, Mr. O'Donnell indicated that:

> I consider the Mold-In-Place/Special Hull Treatment (SHT)
> (MIP/SHT) process as a current area of concern. This is not a hit
> on any one organization, it's simply based on the number of
> method B Corrective Action Requests (CARs) received in 2015,
> the progress of the investigations associated with the CARs and
> discussions with subject matter experts (including engineering,
> craftsmen, Electric Boat, and SUP SHIP NN), etc.
>
> My belief is that the customer (Navy) may be considering
> elevation to a method C or method D for this process. We have
> initiated our Area of Concern protocol and analyzed all CARs,
> Unplanned Events, QIMs, and Audits for the subject over the last
> two years to understand the scope and history of the problem,
> and are in the process of evaluating the causes and actions
> identified and taken to address the known issues.

69.     Mr. O'Donnell works completely separate from the K93 QA group that had

already issued a SDR for the SHT/MIP Program and Departments E46 and X32's work.

Likewise, an elevation to method D by the Navy would constitute a very serious problem with

construction. As a result, this email reflects that the United States Navy was dissatisfied about

the work performed by the NNS SHT/MIP group. This confirms that two separate organizations

at NNS had recognized that there were major defects in the work performed by Departments E46

and X32 related to the TPAC application in addition to the Relator's observations concerning

same. Despite the multiple people to which the email was sent, no corrective action was taken by

NNS.

70.     On October 8, 2015, the Relator's personal cell phone was confiscated by NNS security. The Relator was advised by Amarita Kim in HR that the company believed the Relator to be a security threat because he had inadvertently left his cell phone in his personal car's center console while driving in the yard after hours to support the trades. The company held the cell phone for four weeks and found photographs of the discrepant TPAC material applied to the hull 677D Fairing Cap, which were taken in a public place in Boston, MA while the part was having the TPAC removed. The Relator took the photographs and immediately forwarded them to NNS E12 management, as well as the Design Yard, because foreign and uncured material was found on the part that had been concealed by E46. HR had the photographs destroyed and the Relator was given a Final Written Warning and advised that he cannot seek another job within the company or be promoted for one (1) year. In addition, the Relator's exemplary performance ratings of 3's and 4's for 2015 were changed to a rating of 1, as directed by Amarita Kim. The Relator has never received such a low rating in 15 years at NNS.

71.     Upon further investigation, it became apparent to Relator that the continued failure of the exterior coatings for submarines delivered by Huntington Ingalls to the Navy has been a result of the failure of NNS to follow the proper specifications for the utilization of TPAC as an adhesive to bind the sound dampening material to the exterior of the submarines. This is consistent with the numerous reported problems on submarines that have been delivered by Huntington Ingalls to the Navy in the past.

72.     Moreover, the quality problems associated with the exterior hull coatings continue to plague the Virginia Class Submarine Program as evidenced by the fact that the newest ship in the fleet, the USS John Warner (SSN-785) endured numerous areas of SHT/MIP/TPAC loss during her Bravo Sea Trials. The Warner recently returned to NNS in early March 2016 for her

Post Shakedown Availability (PSA) and exhibits extensive amounts of lost SHT/MIP/TPAC surface treatments. The exterior hull coatings have come adrift or been completely ripped off the hull on the Sail, Fat Line Towed Array, and throughout the length of the hull. Most areas exceed 3 feet by 5 feet, with one area on the Starboard Side in excess of 15 feet by 15 feet. This is a direct result of either an improper mixture of SHT/MIP/TPAC material or improper application with inadequate inspection techniques.

73.     Contract numbers for the ships for which the TPAC was applied improperly to the hull are summarized in Table I.

74.     The failure of the exterior coatings on the Virginia-class submarines as a result of the improper application of TPAC results in inefficient performance of the submarines and loss of their sound absorbing exterior coating, thereby making the submarines easily detectable and placing them at risk during operations. Further, to the extent that the submarines can be detected by adversaries, it affects the strategic capabilities of the United States Navy, constitutes a risk to crew safety, and impacts the national security of the United States.

75.     Each Virginia-class submarine historically costs about $1.8 billion dollars to construct, which is charged to the Navy. In December of 2008, the Navy signed a $14 billion dollar contract with Huntington Ingalls predecessor (Northrup Grumman) and General Dynamics to construct eight submarines, which constitutes the Block III submarines covering hull numbers SSN-784 through SSN-791. This is a $14 billion multiyear procurement. Upon delivery of these submarines by Huntington Ingalls to the Navy, Huntington Ingalls certified that the exterior coating material was properly adhered to the hull with the TPAC product, when clearly it was not.

## IV.    SEPARATE COUNTS

### COUNT I

### Scheme to Submit Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

76.    All allegations set forth in Paragraphs 1 through 75 of this Complaint are incorporated into this Count as if fully set forth herein.

77.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

78.    The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments that would otherwise not have been allowed or paid.

79.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### COUNT II

### Submission of Claims Containing False Express or Implied Certifications (31 U.S.C. § 3729(a)(1)(A))

80.    All allegations set forth in Paragraphs 1 through 79 of this Complaint are incorporated into this Count as if fully set forth herein.

81.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be

made by defendant – material to false or fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(B).

82.     The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments that would otherwise not have been allowed or paid.

83.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT III

### False Claims Conspiracy (31 U.S.C. § 3729(a)(1)(C))

84.     All allegations set forth in Paragraphs 1 through 83 of this Complaint are incorporated into this Count as if fully set forth herein.

85.     By means of the acts described above, Defendants knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid by the United States.

86.     The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments that would otherwise not have been allowed or paid.

87.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT IV

### Retaliation Against Relator, Ari Lawrence, by Huntington Ingalls, Inc. In Violation of 31 U.S.C. § 3730(h)

88.    All allegations set forth in Paragraphs 1 through 87 of this Complaint are incorporated into this Count as if fully set forth herein.

89.    This is an action pursuant to 31 U.S.C. § 3730(h).

90.    By virtue of the activities described above, Relator Ari Lawrence has engaged in protected conduct under the False Claims Act.

91.    Defendant, Huntington Ingalls Industries, Inc., was aware of Relator Ari Lawrence's actions.

92.    Defendant, Huntington Ingalls Industries, Inc., discriminated against Relator Ari Lawrence from at least March 2015 through the present, in retaliation for his aforesaid conduct protected under the False Claims Act, as follows:

(a)    By blocking Relator's promotion from an E3 Senior Engineer to an E4 Project Engineer;

(b)    by demoting Relator from his position as the System Expert with Technical Authority over the Chin Array and sending him to the "yard" to work on his "engineering rigor."

(c)    by falsely reporting Relator as a security threat and confiscating his cell phone; and

(d)    by changing his exemplary performance ratings of 3s and 4s for 2015 to a rating of 1, the lowest rating that Relator has ever received in the fifteen years he worked at NNS, all of which retaliation and discrimination was directed by Amarita Kim of NNS' HR department.

# DEMAND FOR RELIEF

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants as follows:

A.      That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false and fraudulent claims alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

B.      That civil penalties be imposed in the maximum amount for each and every false and fraudulent claim that Defendants presented to the United States;

C.      That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relators necessarily incurred in bringing and pursuing this action;

D.      That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

E.      That pursuant to § 3730(d), Relator be awarded the maximum percentage of the amount recovered by the United States as a result of this action;

F.      That Relator Ari Lawrence be awarded compensation for the retaliatory actions taken against him in violation of the § 3730(h) in the following amounts;

      (a)      lost compensation based on the same seniority status as Relator would have had but for the retaliatory action;

      (b)      two times the amount of back pay;

      (c)      interest on the back pay;

      (d)      compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees;

G.      That this Court award such other further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Respectfully submitted,

John S. Vento, Esq. (FB No. 329381)
TRENAM LAW
101 E. Kennedy Boulevard, Suite 2700
Tampa, FL 33602
Telephone: 813-227-7483
Email: JVento@trenam.com

James H. Shoemaker, Jr.
Virginia State Bar No. 33148)
Andrew J. Dean
Virginia State Bar No. 88192
Florida State Bar No. 121808
PATTEN, WORNOM, HATTEN &
DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: 757-223-4500
Facsimile: 757-249-1627
Email: jshoemaker@pwhd.com
*Pro Hac Vice Admission Pending*

Kenneth R. Yoffy (VSB No. 20549)
C. Thomas Turbeville, Jr. (VSB No. 30641)
YOFFY & TURBEVILLE, PLC
4805 Courthouse Street
Williamsburg, Virginia 23188
Telephone: 757-259-0800
Email: kyoffy@mac.com
Email: tomtlaw@mac.com
*Pro Hac Vice Admissions Pending*

℺JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)   PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America, ex rel. and Ari Lawrence | Huntington Ingalls Industries, Inc., Huntington Ingalls Incorporated, and Northrop Grumman Corporation |

**(b)**   County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**   Attorney's (Firm Name, Address, and Telephone Number)

John S. Vento, Trenam Law, 101 E. Kennedy Blvd.,Ste. 2700, Tampa, FL
813-223-7474

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☒1   U.S. Government
Plaintiff

☐2   U.S. Government
Defendant

☐3   Federal Question
(U.S. Government Not a Party)

☐4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV.  NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒1  Original
Proceeding

☐2  Removed from
State Court

☐3  Remanded from
Appellate Court

☐4  Reinstated or
Reopened

☐5  Transferred from
another district
(specify)

☐6  Multidistrict
Litigation

☐7  Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
False Claims Act - 31 U.S.C. 3728 et. seq.
Brief description of cause:
This is an action under the False Claims Act

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions):      JUDGE _____      DOCKET NUMBER _____

DATE
5/10/16

SIGNATURE OF ATTORNEY OF RECORD
(John S. Vento)

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____