**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**UNITED STATES OF AMERICA,**

*Ex rel* **Ari Lawrence,**

      **Relator-Plaintiff**

**v.**                                     **Case No.: 3:16-cv-576-J39-PDB**

**HUNTINGTON INGALLS INDUSTRIES,
INC.,**

**HUNTINGTON INGALLS
INCORPORATED,**

**and**

**NORTHROP GRUMMAN
CORPORATION,**

      **Defendants.**

**FIRST AMENDED FALSE CLAIMS ACT COMPLAINT
AND DEMAND FOR JURY TRIAL**

On behalf of the United States of America, Relator-Plaintiff, Ari Lawrence (hereinafter "Relator"), by counsel, files this *qui tam* First Amended Complaint against Huntington Ingalls Industries, Inc. ("Huntington Ingalls Industries"), Huntington Ingalls Incorporated d/b/a Newport News Shipbuilding, a Tenneco Company ("Huntington Ingalls Incorporated" or "Newport News Shipbuilding" or "NNS") and Northrop Grumman Corporation ("Northrop Grumman") (herein collectively referred to as "Defendants") and alleges as follows:

**I.     INTRODUCTION**

1.     This is an action to recover treble damages and civil penalties in excess of $100 million on behalf of the United States of America from Defendants for knowingly and/or recklessly

presenting false claims to the United States government in violation of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*. Defendants falsified testing, quality inspection results, and certifications on multi-billion dollar submarine contracts which induced the Government to pay Defendants in-full for submarines with significant combat-readiness defects that have the potential for putting American lives and national security at risk.   More specifically, as to critical components of the submarines, including the application of the sound-dampening exterior hull coating, the Defendants: 1) failed to develop a first article testing procedure; 2) failed to produce sample test articles; 3) failed to perform mechanical and physical property tests on said samples; 4) failed to demonstrate processing ability; 5) failed to receive first article qualification from the applicable technical authority prior to commencement of work; 6) failed to develop and maintain a training program that ensured that all personnel were properly educated and certified; 7) failed to train key personnel; 8) failed to obtain certification for certain critical  equipment; and 9) failed to develop and maintain internal processing handling and quality inspection procedures. Nevertheless, the Defendants falsely certified in their payment applications that all such certifications and procedures had been met.

2.	When the Relator complained about the fraudulent conduct described herein to Defendants' management, he was awarded a poor performance evaluation for the first time in more than 15 years of service and was then terminated in direct retaliation for his complaints.  These actions were taken in violation the Anti-Retaliation provisions of the FCA, 31 U.S.C. § 3730(h).

## II.	PARTIES, JURISDICTION AND VENUE

3.	Prior to the filing of this Complaint, and as potentially required by the FCA, 31 U.S.C. § 3730(b)(2), Relator has previously provided to the Attorney General of the United States and the United States Attorney for the Middle District of Florida, a Sworn Disclosure Statement

containing all material evidence and information related to this First Amended Complaint. The Sworn Disclosure Statement is supported by material evidence known to the Relator establishing the existence of Defendants' false claims. Because the Sworn Disclosure Statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and the United States Attorney in their capacity of potential co-counsel in the litigation, the Relator asserts that  this disclosure is confidential.

4.      The Relator, Ari Lawrence, is a citizen of the United States and a resident of the Commonwealth of Virginia. At all times relevant hereto, he was a Senior Structural Engineer in the Submarine Engineering Department with technical expertise related to the construction of Virginia-class attack submarines at the Huntington Ingalls Newport News Shipbuilding facility in Virginia.

5.      Northrop Grumman is an aerospace and defense technology company and was the fifth largest defense contractor in the world as of 2015. Northrop Grumman employs approximately 85,000 people worldwide. The company is headquartered in Falls Church, Virginia. For 2015, the company's net earnings totaled approximately Two Billion Dollars ($2,000,000,000.00). Northrop Grumman has operations throughout the United States and the world and further has offices located at 5401 West Kennedy Boulevard, #1000, Tampa, Florida; 4500 NW 27th Avenue, #D, Gainesville, Florida; and 5000 U.S. 1, Saint Augustine, Florida. On November 7, 2001, Northrop Grumman entered into an agreement to purchase Newport News Shipbuilding for a total of $2.6 billon, which created Northrop Grumman Newport News. In January of 2008, Northrop Grumman realigned its two shipbuilding sectors (Northrop Grumman Newport News and Gulf Coast-based Northrop Grumman Ship Systems) to create a single sector

Northrop Grumman Shipbuilding. On March 31, 2011, Northrop Grumman Shipbuilding spun off its shipbuilding division to create Huntington Ingalls Industries.

6.      Huntington Ingalls Industries, Inc. is a corporation organized and existing under the general corporation law of the state of Delaware. Huntington Ingalls Industries is America's largest military shipbuilding company with its headquarters in Newport News, Virginia. Huntington Ingalls Industries employs approximately 40,000 people operating both domestically and internationally. Huntington Ingalls Industries also performs work in Pascagoula, Mississippi; Virginia Beach, Virginia; Broomsfield, Colorado; Panama City, Florida; Houston, Texas; and San Diego, California and also has employees in various places throughout the nation, including Groton, Connecticut; Kingston, Rhode Island; and at a subsidiary company (Universal Pegasus International) in Tampa, Florida. Many of the acts complained of herein occurred both prior to and after the spin-off of Huntington Ingalls Industries from Northrop Grumman.

7.      Huntington Ingalls Incorporated is a Virginia Corporation. It has filed a fictitious name statement with the Virginia State Corporation Commission indicating that it also operates under the name of Newport News Shipbuilding, a Tenneco Company. Huntington Ingalls Industries publicly advertises that Newport News Shipbuilding is a division of Huntington Ingalls Industries. As a result, upon information and belief, Huntington Ingalls Incorporated is a division and wholly-owned subsidiary of Huntington Ingalls Industries, Inc.  In addition, Huntington Ingalls Industries and Newport News Shipbuilding have common ownership, an integrated management structure and their operations and operational plans are intertwined.  The managing officers of Newport News Shipbuilding ultimately report and answer to executives at Huntington Ingalls Industries at all times relevant to this Amended Complaint.  There is also overlap of officers and directors of Huntington Ingalls Industries and Newport News Shipbuilding.

8.     The United States District Courts have exclusive jurisdiction over actions brought under the FCA pursuant to 31 U.S.C. §3732, and otherwise have jurisdiction under 28 U.S.C. §§1331 and 1345. At all times relevant hereto, the Defendants regularly conducted substantial business in Florida and maintained and operated sales division offices in this District and Division. Accordingly, the Defendants are subject to personal jurisdiction in this District. Venue is appropriate in the Middle District of Florida pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391(b)(1) and (2).  Section 3732(a) of the FCA provides that "any action under Section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act prescribed by Section 3729 occurred." Relator began employment with Huntington Ingalls' predecessor (Northrop Grumman Corporation) in October of 2001 as an Engineering Associate I. He continued his employment under Newport News Shipbuilding and was promoted to a Senior Structural Engineer. He has direct knowledge of the facts herein and is the original source of the same. While he is unaware of any of the counts, fraud allegations and/or any of the acts described herein in violation of 31 U.S.C §3729 having been publicly disclosed as contemplated under 31 U.S.C. §3730(d)(4)(B), he has made voluntary disclosure of substantially all evidence and information in his possession to authorities responsible for investigating these allegations prior to filing this Complaint and is an original source of the information contained in the Complaint.

9.     Under the FCA, the original Complaint was filed *in camera* and under seal. This First Amended Complaint is filed pursuant to this Court's order of October 1, 2019.

### III.    FACTS COMMON TO ALL COUNTS

#### A.    Introduction

10.    Newport News Shipbuilding is believed to be a division of Huntington Ingalls Industries located in Newport News, Virginia. Virginia-class submarines are built through an arrangement between Huntington Ingalls, in Newport News, Virginia and General Dynamics Electric Boat in Groton, Connecticut (hereinafter referred to as "Electric Boat"). Under the arrangement, the Newport News Shipbuilding facility builds the stern, habitability and machinery spaces, torpedo room, sail and bow; whereas, Electric Boat builds the engine room and control room. Newport News Shipbuilding and Electric Boat alternate work on the reactor plant, as well as the final assembly, testing, outfit and delivery of the boats.

11.    The Relator was, and continued to be up until the date of his termination, the Subject Matter Expert (SME) and the "System Owner" for the system known as the  High Frequency Chin Array ("Chin Array"), which is a bow mounted sonar system on the Virginia-class submarines. The "Chin Array," which is a subject of the false claims herein and described in the following paragraph, is always installed by Newport News Shipbuilding.

12.    In the course of his employment, Relator discovered that certain departments at the Newport News Shipbuilding facility did not have appropriate and required qualifications to apply a certain two-part adhesive surface coating ("TPAC") to the exterior of the Chin Array. The TPAC is a binding agent that is utilized to attach the Virginia-class submarines' stealth exterior sound absorbing materials to the entire submarine hull. As more fully described below, when Relator pressed for documentation validating the required certifications and pre-qualifications, officials in the responsible departments at Newport News Shipbuilding were unable to produce it. When directed to perform critical, contractually mandated tests, certain of these officials falsified test reports and equipment certifications in an attempt to conceal the fact that they were not qualified

to apply the TPAC. In addition, the Newport News Shipbuilding Quality Assurance ("QA") Department performed a "Pulse" Audit of the departments involved in applying the TPAC and immediately issued a Serious Deficiency Report (SDR) to the Submarine Engineering Department ("SUBE") and Trade Management noting that they did not have the proper qualifications, documentation, or training required to perform the work. Moreover, an independent Director at Newport News Shipbuilding also identified the deficiencies and voiced the Navy's growing concerns over the poor quality of work occurring at Newport News Shipbuilding with respect to the TPAC.

13.     Notwithstanding Relator's requests, Newport News Shipbuilding took no steps to cease utilizing the TPAC improperly, ignoring the objections of SUBE and QA, and exerted pressure on employees to improperly certify and accept the work performed.

14.     The knowing failure of Newport News Shipbuilding to have certified and pre-qualified applicators is a violation of the Navy's design specifications and contractual requirements; and Newport News Shipbuilding took deliberate efforts to conceal the lack of qualifications, procedures, and training as required by the Navy.

15.     In addition, in the process of investigating these serious deficiencies, Relator discovered that Newport News Shipbuilding had never obtained proper qualifications and certifications for the use of TPAC on the Virginia-class submarines for *any* applications. These qualifications and certifications are critical to ensure that the personnel, equipment and processes used to mix and apply the TPAC and otherwise adhere the exterior sound dampening materials to the hull are properly performed.

16.     Since the commencement of the program, as a consequence of Newport News Shipbuilding's failures to follow the Navy's contracting requirements and specifications as alleged

above, Virginia-class submarines have been plagued with serious adhesive failures of the exterior hull coating due to the failure of the binding agent. The problems with the binding agent have continued to this date.

17.     The failure of this exterior sound-absorbing material jeopardizes the safety of the submarines, and makes the submarine easier to detect by those who would seek to harm the United States, thereby endangering the crew and national security. The failure of the sound-absorbing material is a direct result of Newport News Shipbuilding's failure to adhere to proper Navy contract specifications and a direct effort to conceal that lack of qualifications and certifications required by the Navy.

## B.     Background of Virginia-Class Submarines

18.     In 1998, the United States Navy awarded a $4.2 billion dollar contract for the construction of the first four boats of the class. USS Virginia (SSN-774) was the first of these. On December 22, 2008, the United States Navy awarded a $14 billion dollar contract to Electric Boat and Huntington Ingalls' predecessor (Northrop Grumman) for eight more Virginia-class submarines. The contract called for the delivery of one submarine in each fiscal year of 2009 and 2010 and two submarines in each fiscal year 2011, 2012 and 2013. In December of 2010, the United States Congress passed a defense authorization bill that expanded production to two submarines per year, which resumed on September 2, 2011, with the commencement of construction of the USS Washington (SSN-787).

19.     The Virginia-class submarines have been constructed in "Blocks." These Blocks are summarized in Table I below that includes the status of the construction and/or delivery of the vessels and further includes the internal designation or ship number used by Newport News Shipbuilding in Newport News.

Table I – Virginia-Class Submarine Construction

| Block | Name & Hull # | Newport News Ship Number | Status | Final Delivery By | Contract Amount | Contract Number |
|-------|---------------|--------------------------|--------|-------------------|-----------------|-----------------|
| I | USS Virginia (SSN-774) | | Commissioned and in service | Electric Boat | | |
| I | USS Texas (SSN-775) | | Commissioned and in service | Newport News Shipbuilding | | |
| I | USS Hawaii (SSN-776) | | Commissioned and in service | Electric Boat | | |
| I | USS North Carolina (SSN-777) | | Commissioned and in service | Newport News Shipbuilding | | |
| II | USS New Hampshire (SSN-778) | | Commissioned and in service | Electric Boat | | |
| II | USS New Mexico (SSN-779) | | Commissioned and in service | Huntington Ingalls | | |
| II | USS Missouri (SSN-780) | | Commissioned and in service | Electric Boat | | |
| II | USS California (SSN-781) | | Commissioned and in service | Huntington Ingalls | | |
| II | USS Mississippi (SSN-782) | | Commissioned and in service | Electric Boat | | |
| II | USS Minnesota (SSN-783) | | Commissioned and in service | Huntington Ingalls | | |
| III | USS North Dakota (SSN-784) | NN 669 | In Service | Electric Boat | | |
| III | USS John Warner (SSN-785) | NN 670 | In Service | Huntington Ingalls | | |

| III | [Illinois] SSN-786 | NN 671 | In Service | Electric Boat | | |
| III | [Washington] SSN-787 | NN 672 | In Service | Huntington Ingalls | | |
| III | [Colorado] SSN-788 | NN 673 | In Service | Electric Boat | | |
| III | [Indiana] SSN-789 | NN 674 | In Service | Huntington Ingalls | | |
| III | [South Dakota] SSN-790 | NN 675 | In Service | Electric Boat | | |
| III | [Delaware] SSN-791 | NN 677 | Launched | Huntington Ingalls | | |
| IV | [Vermont] SSN-792 | | In Service | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [Oregon] SSN-793 | | In Service/christened | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [Montana] SSN-794 | | Under Construction | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Hyman G. Rickover] SSN-795 | | Under Construction | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [New Jersey] SSN-796 | | Under Construction | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Iowa] SSN-797 | | Under Construction | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | [Massachusetts] | | Under Construction | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Idaho] SSN-799 | | Under Construction | Electric Boat | $17,650,394,416 | N0002412C2115 |
| IV | SSN-800 | | Under Construction | Huntington Ingalls | $17,650,394,416 | N0002412C2115 |
| IV | [Utah] SSN- | | Under construction | Electric Boat | $17,650,394,416 | N0002412C2115 |

20.     The ten Virginia-class boats shown in Table 1 for the period of FY2014-FY2018 (referred to as the Block IV boats) are being procured under a multiyear procurement (MYP) contract that was approved by Congress as part of its action on the FY2013 budget, and awarded by the Navy on April 28, 2014. The award identification number was N0002412C2115 and the base and exercise options value of the contract was $17,650,394,416. The eight Virginia-class boats procured in FY 2009-FY2013 (Block III boats) were procured under a previous MYP contract, and the five Virginia-class boats procured in FY2004-FY2008 (Block II boats) were procured under a still-earlier MYP contract. The four boats procured in FY1998-FY2002 (the Block I boats) were procured under a block buy contract, which is an arrangement somewhat similar to an MYP contract. The boat procured in FY2003 fell between the FY1998-FY2002 block buy contract and the FY2004-FY2008 MYP arrangement and was contracted for separately.

### C.     Submarine Hull Coating Problems

21.     Since the inception of the program, the Virginia-class submarines have been plagued with problems with their exterior hull coating system.

22.     The hull and external structures of the Virginia-class submarines contain a specialized exterior hull coating that is designed to be "anechoic," which means that the coating absorbs the sound waves of active sonar so they do not bounce back to the ship or submarine emitting the signal, thus evading sonar detection.  The coating also dampens and insulates interior submarine noise making it more difficult to detect by passive acoustic (listening) technology. To the extent that this exterior hull coating fails, this imperils an underway submarine by making it easier to detect by sonar location and passive acoustic measures.

23.     The exterior hull coating is applied to the submarine by Defendants with a two-part adhesive coating as discussed above, the "TPAC."

24.     The United States Navy started reporting problems with the separation of the exterior coating in 2007 on the USS Virginia, which was the first submarine of the class. At that time, it was clear that there was a de-bonding problem with the exterior coating. In fact, on the USS Virginia, and subsequently delivered Virginia-class submarines, the exterior coatings tore off submarines while underway, often in large sections up to hundreds of square feet. Furthermore, the Pentagon's top weapons tester at the Office of the Director, Operational Test & Evaluation (DOT&E) released a scathing report on June 30, 2010 on the Virginia-class submarine's tendency to shed its sound-dampening hull coating.

25.     On January 20, 2010, the Daily Press, a Newport News, Virginia-based newspaper reported that the coating that had peeled off in the earlier submarines in large swaths appeared to be adhering better to new boats, as indicated by a top Navy procurement official. The report indicated that after the Navy found that the sonar absorbing coating had major adhesive failures on three of the first four submarines in its class, they initiated an investigation to determine the cause of the problem and how to fix it. The newspaper article further quoted Vice Admiral Kevin M. McCoy, Commander of Naval Sea Systems Command, stating that "we think, for the most part, those issues are behind us." McCoy further stated that the Navy's investigation revealed "no single smoking gun" and that he was very confident going forward that the Navy's submarine would retain its exterior coating that is necessary to keep the ship silent and stealthy. The article further indicated that effectiveness of the submarines was being fixed during normal dry-dock maintenance.

26.     Despite the Navy's public assurances, evidence indicates that the exterior coatings of the Virginia-class submarines have continued to fail since that date. One observer published an article on September 6, 2010 entitled "A Virginia Class – When Does Hull Coating Separation

Endanger the Boat?" This individual, Craig Hooper, referenced the DOT&E report and further quoted Allen Baribeau, with Naval Sea Systems Command, in an interview from Inside the Navy, wherein he stated "[t]he de-bonding issue has been aggressively pursued since its recognition in 2006," the statement reads, "the problem was largely due to immature application processes, which have been corrected on late ships. Because of the parallel construction process, [the hull treatment] was applied to several ships before the first at-sea testing of Virginia. The program office continues to monitor the performance of all ships and pursue improvement."

27.     Mr. Hooper went on to observe that based upon the pictures available, it appeared that every Virginia-class submarine was suffering from an "ugly tendency to shed their hull treatment" and questioned whether this could affect survivability. The article included recent photographs of the USS Virginia and USS Hawaii showing large sections of their surface treatment ripped away.

28.     In fact, these same problems continue today both on the hull as well as on external structures of recently constructed Virginia class submarines. Photographs taken on April 15, 2019 and released by the Defense Visual Information Distribution Services (DVIDS) of a recently constructed Virginia class submarine shows extensive failures of the exterior hull coating system.

### D.     The High Frequency Chin Array

29.     As previously discussed, the Virginia-class submarines are built in a cooperative agreement by Electric Boat and Newport News Shipbuilding. The two shipyards construct different sections of the boat and then alternate for the final assembly and delivery of the boats; Newport News Shipbuilding will deliver one boat and Electric Boat will deliver the next.

30.     Each submarine has a High Frequency Chin Array (the "Chin Array" or "HFCA" that is installed directly under the bow so as to give an unobstructed acoustic view in front of and below the submarine. Newport News Shipbuilding installs the Chin Array on all Virginia-class

submarines regardless of whether the boat is delivered by Newport News Shipbuilding or Electric Boat. The Chin Array is a passive high-resolution sonar system.

31.     The Chin Array's composite fairing cap and tail fairings have historically been covered with a neoprene boot for protection. Due to boot vulnerabilities and failures, the decision was made to change the design from a molded neoprene boot that is adhered to the fairings using epoxy, to a casted/pourable TPAC material utilized as a boot due to its high performance and durability.

32.     The Chin Array components are designated as "buy" parts that are subject to government competitive bid requirements in addition to requirements that the parts be procured and manufactured only from qualified suppliers. Pursuant to Newport News Shipbuilding's contract with the Navy, the shipyard is contracted to only install compliant parts on the hull. As discussed below, certain groups within the Huntington Ingalls organization sought instead to install the TPAC boot to the procured fairings themselves, claiming it would lower acquisition costs. Further, these groups maintained that Newport News Shipbuilding was fully qualified to pour the TPAC boot and that it would be a waste of money for Newport News Shipbuilding to pay a supplier to become qualified to do this work.

33.     There were two Newport News Shipbuilding Departments that were primarily involved in advocating pouring the boots in-house.  Department E46 which is the Special Hull Treatment (SHT) and Mold In Place (MIP) group, and Dept O93 which is the Newport News Shipbuilding Virginia Class Submarine (VCS) Program Office. E46 acts as a technical support group to Department X32, which is the Trade Department that installs MIP and SHT to the hull. E46 should maintain all Newport News Shipbuilding documentation, certifications, procedures and training programs related to MIP/SHT for X32. Subsequently, all X32 trades performing work

with respect to the TPAC material shall hold and maintain certifications to mix and apply MIP/SHT on hulls. Department E46 is not a functional engineering group at Newport News Shipbuilding. As such, they do not hold technical authority to deviate from the Class Design requirements, nor are they authorized to direct trades to perform work. Department E46 is akin to a research and development team, whereas SUBE holds the functional engineering disciplines (Hull Structures, Mechanical, Electrical, and Submarine Piping) that hold all technical authority as the drawing and system owners.

34.     The design change from a neoprene boot to a TPAC boot came in the middle of the Block III contract with the Chin Array fairing supplier. In order to mitigate out of scope design change fees, both Newport News Shipbuilding and Electric Boat agreed that Electric Boat trades (who are presumably qualified) should install the TPAC boots to Block III hulls 673D thru 677D. Then the Design change can be implemented on the Block IV hulls, which had not yet started, so that qualified suppliers could competitively bid for the work. This scenario was included in the Virginia-class Submarine Block IV technical baseline design that was agreed upon between the United States Navy, Electric Boat, and Newport News Shipbuilding, and believed to be the most cost-effective method.

35.     New construction work must be performed in accordance with the applicable Drawings, invoked Specifications, Part Number requirements, and the Purchase Order. For out of scope work, Trades or "Tiger Teams" (installation and repair trades at various naval installations worldwide who perform emergent repair work) must perform work in accordance with an Engineering Report (ER).

36.     The first instances of Neoprene boot failures occurred while the ships were in service, therefore replacement TPAC boots were successfully installed by Electric Boat Tiger

Teams via ER. Accordingly, the 673D thru 677D (Block III) TPAC Electric Boat trade installation requirements were to be in accordance with:

| |
|---|
| FMR# XXXXXX[1] – Navy Authorization and Funding to perform the work and Authorization Contract No. N00024-09-C-2104 and Contract Ch. No. N0684.0861A |
| ERHXXX-XXXXXXX Rev. X – Engineering Authorization and requirements to perform the work |
| XXXX-XXXX MIP/SHT TPAC Processing manual and requirements (mixing etc.)[2] |
| EB XXXX TPAC Qualification and Material requirements |
| NAVSEA XXX-XXXXXXX TPAC Qualification and Material requirements |
| XXXX-XXXX HFCA DWG |

37.     Going forward for the 678D (Block IV), All Future Ships (AFS) New Construction Chin Array Design TPAC installation requirements are to be in accordance with:

| |
|---|
| EB Spec XXXX – Chin Array Procurement Specification |
| XXXX-XXXX Chin Array Piece Part Drawing Detail and Class Design Requirements |
| P/N XXXXXXXX-XX thru XX – Part Number contractual requirements and associated standard clauses and coded notes |
| EB XXXX - TPAC Qualification and Material requirements |
| NAVSEA XXX-XXXXXXX – TPAC Qualification and Material requirements |

38.     Matt Shaffer from NNS Department E46 approached the Chin Array System owner (Relator) and requested the opportunity to share this work with Electric Boat and install the TPAC boot in-house to finish the Block III boats. Mr. Shaffer stated that Newport News Shipbuilding could install a higher quality TPAC boot than Electric Boat at a lower cost than any supplier. Mr. Shaffer stated that Newport News Shipbuilding (E46/X32) was fully qualified for all invoked TPAC requirements for the MIP/SHT Program in accordance with MIP/SHT TPAC Processing

---

[1] Certain specification/design standards have been redacted in response the government's request to maintain information related to the construction process as confidential.
[2] Note that this specification is a shipbuilder only document. Suppliers cannot perform work from this document.

manual and requirements (mixing etc.) ("the MIP/SHT Manual") standards. The Relator, however, advised Mr. Shaffer that Newport News Shipbuilding was not qualified to meet the existing requirements, nor the Block IV Chin Array requirements in accordance with EB Spec XXXX Chin Array Procurement Specification as these requirements are far more stringent than the SHT/MIP Manual requirements. He further advised Mr. Shaffer that the company would expend significant expense attempting to become qualified, instead of using one of several other suppliers who were already qualified to perform the work. The relator also provided documented evidence in the form of Engineering Reports (ERs) and photographs of multiple instances where E46/X32 had failed at mixing and adhering the TPAC material to exterior structures made of the same material as the HFCA Fairings. E46/X32 have repeatedly applied non-compliant TPAC material to the High Efficiency Inlet (HEI) Doors, Dozens of Fat Line Towed Array (FLTA) Covers, and the composite Sail Cusp. Matt Shaffer applied pressure to the Relator by stating if Newport News Shipbuilding did not obtain additional MIP/SHT work, tradesmen within X32 would lose their jobs. The relator reluctantly granted E46/X32 approval to install the TPAC boots to Block III hulls 675D and 677D only, via ER, with the stipulation that they must be taught how to do the work from Electric Boat on hulls 673D and 674D, and SUBE-Department E12 held all final approval authority of the finished parts prior to installation.

39.     The MIP/SHT Manual, which as noted above was a requirement for the Block III replacement TPAC boots, includes the following for all shipboard TPAC Applications:

- **EB XXXX and NAVSEA XXX-XXXXXXX – TPAC Qualification and Material requirements:**
    - NNS First Article Qualifications
    - NNS Engineering Approved Procedures for processing TPAC
    - A NNS Quality Inspection Program for all phases of TPAC Processing in accordance w/ MIL-I, MIL-Q, or ISO standards

Table II – EB Spec XXXX – TPAC Incompressible Wedge Manufacturing

| |
|---|
| First Article Testing and Qualifications |
| Process and Inspection Procedures/System IAW |
| MIL-I Recurring Quality Assurance Inspections |

- **An NNS Training program that provides Trade / Operator Certifications to perform any/all phases of MIP/SHT and TPAC processing and installation work:**

Table III – VCS DWG XXXX-XXXX – Special Hull Treatment
Installation Procedure

| |
|---|
| Section 8.3.1.6 Material Inspection in Accordance with NAVSEA DWG 690- |
|     Visual Inspection per Table 8.2 |
|     Material Verification per Table 8.2 |
|     Certification Records for documentation per NAVSEA DWG 690-6726597 |
| Section 8.3.1.11 TPAC Bonded Shapes |
|     Visual Inspection for Major/Minor Defect Criteria in Table 8-4 |
|     Dimensional requirements as specified by piece part DWG |
|     Material verification |
|     Shore D Hardness documentation |
|     In Process material samples tested for acceptance in accordance w/ NAVSEA DWG 690-6726597 |
|     Certification Records for documentation in accordance with EB Spec |
|     Traceability documentation for raw material batch to finished part |
| Section 9.0 Training |
|     Official Training Records shall be kept |
|     SAT rating required prior to performing any work |
|     Qualified personnel shall be issued a certification card which identifies MIP/SHT training |

• **EB Spec XXXX – Chin Array Procurement Specifications:**

Table IV – EB Spec XXXX – In Chin Array Procurement

| Approved Technical Documents Required Prior to Production |
| --- |
| Section 3.2.1 & 3.11.1.2 Mold and TPAC Installation DWGs |
| Section 3.2.4.1 TPAC First Article Test Procedure |
| Section 3.2.4.1 TPAC First Article Test Report |
| Section 3.2.5 TPAC Installation Procedures |
| Section 3.5 Tool String Matrix |
| Section 3.5 & 3.11.1.3 Component Design Report for Special Tooling (molds, etc.) |
| Section 3.8.4 Alternate Material Use Requests |
| Section 3.11.1.1 Process Specifications |
| Section 3.11.1.3 Special Tool DWGs |
| Section 3.11.1.4 Dimensional Inspection Procedures |
| Section 3.11.1.4 Visual Inspection Procedure |
| Section 3.11.1.4 Ultrasound Inspection and Equipment Calibration Procedures |
| Section 3.11.1.4 Surface Finish Inspection Procedures |
| Section 3.11.1.4 Acceptance and Rejection Criteria Procedures |
| Section 3.11.1.4 Repair and Rework Procedures |
| Section 3.11.1.4 Ultrasound Equipment Procedures |
| Recurring Quality Assurance Certification and Test Reports |
| Section 4.3.5.4 Material Test Documentation |
| Section 4.3.4.5 Material Storage Life Certification |
| Section 4.3.7 Inspection Reports |
| Visual Inspection/Workmanship Report |
| Dimensional Inspection Report |
| UT Result Report and Map |
| Shore D Hardness Measurements and Map |
| Mass Ratio Report |

40.     The Relator advised Departments E46 and X32 that the TPAC shall be applied in accordance with the Chin Array Procurement Specification EB Spec. XXXX. This specification includes the requirements discussed above, such as the "first article" testing and approval, engineering/customer approved procedures, and a quality inspection program. These specifications have always been in place to ensure the parts conform to all contractual requirements. Among other things, the specifications required TPAC first article testing, such that both personnel and equipment were to undergo training, testing, and certification prior to being permitted to install the TPAC on the Chin Array. Also, samples were required to be produced and

19

tested prior to obtaining certification. This is an extensive and time-consuming process as it would require all equipment and application personnel to be certified to apply the materials correctly before any work could be commenced, including the summary of pertinent TPAC EP Spec XXXX Chin Array Procurement Specification requirements that applied to the Chin Array.

41.     One of the Relator's co-workers,  a Senior Structural Designer  in Department E12, discovered that E46 had created an unauthorized time and material charge against the hull 672D chin array, an unauthorized purchase requisition, and then procured significant amounts of raw materials and a TPAC processor. Newport News Shipbuilding was not authorized to charge time or resources to hull 672D HFCA, as funding for that hull was already authorized by the Navy under an UPSA (modification to the 673D - 677D FMR without budget constraints) and directed by Engineering to be performed by a qualified supplier that was already under contract to perform the work.

42.      This Senior Designer submitted a "false charging" complaint in good faith to the "OpenLine" of Newport News Shipbuilding. Newport News Shipbuilding advertises that its OpenLine offers "an anonymous and confidential means to voice concerns or report a suspected violation of our Code of Ethics and Business Conduct without fear of retaliation or coercion." Newport News Shipbuilding further advertises that "[i]ndividuals who witness or suspect that anyone is active against our Code of Ethics and Business Conduct should raise the concern immediately with their management, Human Resources, Business Conduct Officer (BCO) or the OpenLine."  The Senior Structural Designers OpenLine complaint was forwarded directly to the Human Resources Department of Department E46 (which is the group that committed fraud), instead of forwarding the complaint to higher management outside of the department.

43.     As a result of the Senior Designers  report to the OpenLine, a meeting was scheduled with the Human Resources representative for Department E46 and the Human Resources representative for the Relator's department (E12), Submarine Engineering, at which point the Relator and  the Senior Designer were told that Departments E46 and X32 had done nothing improper. Amarita Kim was the HR Representative who blocked any action being taken against Department E46 for False Charging, and insisted that nothing was done improperly.

44.     Matt Shaffer from Department E46, working in conjunction with Department X32 trades, poured the first Newport News Shipbuilding TPAC boot designated for hull 677D in April 2015 on a Chin Array fairing cap. Scott Mader is a Supervisor in Department E46 and was Matt Shaffer's immediate superior. Mr. Mader and Mr. Shaffer advised trade management that the part was fabricated and inspected in accordance with Virginia-class Submarine design and ER requirements and was satisfactory for installation prior to notifying SUBE that the part was ready for inspection. However, pursuant to applicable requirements and ERs, the part required inspection and acceptance by Relator's group—SUBE-Department E12—prior to installation on hull. Upon on-site review of the part, SUBE immediately noted gross and obvious unacceptable defects, adhesion failures, and foreign material. All applicable Chin Array requirements maintain that no defect greater than .25" shall exist without repair and SUBE approval. This particular boot had a Major Defect in excess of 12 feet long across its entire leading edge.

45.     Mr. Shaffer stated that he personally installed this boot and directed X32 to support him in repairing this area without seeking prior SUBE review, direction, or approval, and believed the repair to be satisfactory. Mr. Shaffer, Departments E46, and X32 made numerous attempts to conceal the true as-built condition of the part by sanding over the areas such that an inspector could not see through the normally clear TPAC material. SUBE performed a more thorough inspection

in accordance with the invoked requirements and documented the numerous defects in multiple

ERs directing Departments E46 and X32 to perform extensive corrective actions.

46.     At the same time the issues between Department E46 and E12 (the Relator's

Department) occurred, Department E12 Management authored and submitted a requisition request

for the Relator to be promoted from an E3 Senior Engineer to an E4 Project Engineer based on his

15 years of experience, Master's Degree, and repeated exemplary service and performance ratings.

The requisition/promotion request was approved by the Director of Submarine Engineering as well

as the Vice President of Engineering at Newport News Shipbuilding. However, when the

promotion was submitted to HR to create a requisition, the promotion was denied by Amarita Kim.

47.     Due to the condition and poor quality of the first Fairing Cap with the TPAC boot,

SUBE–Department E12 requested that E46 provide all standard processes and inspection

documentation used when pouring the TPAC material for any/all other applications on the ship.

Departments E46 and X32 were unable to produce any Newport News Shipbuilding created

procedures or documentation for the hull coating, the FLTA fairings, the HEI Doors, or the

Composite Sail Cusp.

48.     The equipment used to mix the TPAC is also required to hold first article

qualifications and approval prior to use pursuant to EB Spec XXXX. This Equipment Qualification

is tied to the equipment manufacturer and the serial number of the specific machine. The use of a

qualified machine does not grant the operator "qualification" to mix the material in that machine.

Department E46 stated that a Qualified Machine would be used to mix and pour the TPAC on the

Fairing Cap. Therefore, E12 also requested that E46 provide a photograph of the Label Plate that

is permanently affixed to the TPAC Processor by the manufacturer typically by rivets or tack

welds. A Label Plate includes the Manufacturers Name, Purchase Order, Part Number, and most

importantly, the Serial Number of the machine and provides quality assurance that the equipment used met applicable specifications and requirements. Matt Shaffer, of Department E46, used a label maker to produce a sticker that read "Serial # 5803," affixed the sticker to the side of the machine, and took a photograph of the sticker and submitted it to Engineering as verification that a qualified machine was used. This was clearly an attempt to fraudulently submit false Objective Quality Evidence (OQE) to demonstrate that a Qualified Machine was used on the part, when, in fact, it was not.

49.     Despite acknowledging a full understanding of the requirements to SUBE prior to pouring a TPAC boot, Departments E46  then claimed to Dept. O93 VCS Program Office that the Fairing Cap only had to meet the requirements specified in the XXXX-XXXX MIP/SHT Manual, and did not have to meet any of the invoked Chin Array requirements, such as EB Spec XXXX Chin Array Procurement Specification and the Chin Array Drawing. Although SUBE who owned all technical authority over the HFCA disagreed with this claim, the Relator investigated the VCS DWG XXXX-XXXX (The MIP/SHT Manual) specifications to determine what that document required for MIP/SHT. The VCS DWG XXXX-XXXX (MIP/SHT Manual) is a specification of over 500 pages with dozens of invoked qualification specifications for the various material types specified, and like EB  XXXX Chin Array Procurement Specification, required first article qualification, Engineering approved processes and inspection procedures, as well as a thorough training and certification program for the trades and operators.

50.     SUBE then issued a follow up ER stating that the Fairing Cap with TPAC boot poured by E46/X32 for Hull 677D did not meet the requirements of EB Spec XXXX Chin Array Procurement Specification, the Chin Array DWG XXXX-XXXX HFCA DWG, ERHXXX-XXXXXXX Engineering Authorization and requirements to perform the work XXXX-XXXX

(MIP/SHT Manual), nor the FMR, and was now deemed Technically Unacceptable for use on a Virginia Class Submarine. Engineering ordered the TPAC boot removed from the part in its entirety.

51.     At this time, VCS Trade Management Bob Meyer and Tom Osbourne, VCS Program Office Tom Ward, along with E46 exerted significant pressure on the Relator and SUBE to accept the part as-is despite its deficient condition. Trade Management Tom Osbourne directed X32 to  refuse the release of the discrepant part to a courier so that it could be shipped to a qualified sub-contractor in Boston to have the boot removed.

52.     The Relator had a heated discussion with his direct manager Rob Szukelewicz in front of numerous Newport News Shipbuilding Carrier, Submarine, and Supplier Quality Engineers over the Relator's refusal to accept the part as-is. According to Rob Szukelewicz it was the Relators job to support E46 in being successful in applying the TPAC material to the HFCA by any means necessary.    Rob Szukelewicz suggested the issue was merely a personality conflict between Matt Shaffer and the Relator, despite evidence of fraud, violation of every requirement specified for the part, and ultimately the blatantly defective as-built condition of the parts produced.

53.     Immediately after the aforesaid discussion, Relator became visibly upset in a Newport News Shipbuilding Parking lot while describing the events to his wife (also a Newport News Shipbuilding Employee), which prompted Newport News Shipbuilding Security officers to approach the couple. The Relator explained the situation to Newport News Shipbuilding security, who concurred that the issue needed to be elevated to Newport News Shipbuilding Upper Management immediately. Newport News Shipbuilding Security Department O15 recommended providing a written statement in their Security Report detailing the pressures by Trade

24

management, the VCS program office, and now Engineering Management to accept the part with known gross and obvious defects and install it on the boat. Newport News Shipbuilding Security stated the written report would be investigated by a different entity and likely be seen by Newport News Shipbuilding Executive Management.

54.     Unfortunately, the Newport News Shipbuilding Security Report, which is the second attempt at documenting and reporting unethical business conduct was recovered and "investigated" by Amarita Kim in HR, who again dismissed any and all claims that wrong-doing had occurred byE46, Trade Management, or the Relators direct manager..

55.     Department E46 Management then sent an e-mail to the VCS Program office copying SUBE stating that the Relator's "choice" to invoke EB Spec XXXX's TPAC Qualification and Material requirements First Article Qualification requirement was "out of scope," therefore suggesting the VCS Program Office should seek additional funding  from the Government. Department E46 went on to claim that the Relator, E12, and SUBE were now invoking additional "new requirements" for the Chin Array with a TPAC boot that E46 had not planned for, which significantly increased Newport News Shipbuilding's cost and extended the schedule to perform the work. The year before, however, Scott Mader of Department E46 sent an email dated Dec. 10, 2014, that attempted to persuade the Newport News Shipbuilding Program Office (Tom Ward, Anna Yarashus, and David Vincent) to choose Department E46 to perform the work in lieu of a supplier to save costs. In the email, Mr. Mader stated that the TPAC installation on the Chin Array must be accomplished in accordance XXXX-XXXXMIP/SHT Manual and EB Spec XXXX TPAC Qualification and Material requirements, which requires First Article Qualification and approved procedures. Mr. Mader claimed that Newport News Shipbuilding Department E46 had already met all of the requirements of XXXX-XXXX MIP/SHT Manual and EB Spec XXXX TPAC

Qualification and Material requirements, and that Newport News Shipbuilding would incur unnecessary additional costs to pay for a supplier to meet these requirements. This demonstrates that Scott Mader and E46 knew of the requirements well in advance of the orchestrated effort to shift  the work from a qualified supplier to X32, falsely claimed that E12 and the relator invoked added scope to the HFCA, and unethically suggested additional Government funding should be sought.

56.    Once it became apparent that E46/X32 did not hold even the bare-minimum qualification requirements for TPAC, the Newport News Shipbuilding Chief Engineer Charles Southall advised Department E46 and X32 that they shall perform First Article Testing in accordance with EB Spec XXXX TPAC Qualification and Material requirements and submit it to SUBE-Department E12 for Approval. In addition, because of his refusal to accept the non-compliant material or provide technical support to Dept. E46, Charles Southall, Newport News Shipbuilding Chief Engineer suggested/recommended to Rob Szukelewicz and Michelle Guilford that the Relator be relieved of his current duties and transferred to the waterfront to learn and improve his "Engineering Rigor."

57.     EB Spec XXXX TPAC Qualification and Material requirements  is applicable across all Submarine Programs (688 Class, SSN 21 Class, Ohio Class, and Virginia Class) for all TPAC applications and requires an entity seeking to perform that work to produce a sample of TPAC, provide all Objective Quality Evidence (OQE), perform an inspection of the sample, provide test results, and then develop processes and quality inspection procedures in accordance with MIL-I, prior to beginning production parts.

58.    On August 27, 2015, Department E46 submitted a First Article PowerPoint presentation to SUBE-Department E12 for approval. Upon review of the document, SUBE noted

that it included a photograph of a TPAC sample that was the same photograph of a sample previously submitted by an Electric Boat sub-contractor for qualification of their TPAC Processor. When Department E12 requested to inspect the sample used for testing, Scott Mader and Matt Shaffer of Department E46 stated the sample had been thrown out within days of performing the test. Jim Sterns of the Chief Engineer's Office deemed the 1st Article presentation adequate and pressed the Relator to accept the document and grant qualification to Department E46. The Relator refused and questioned Scott Mader if Department E46 had any prior experience with performing First Article Testing, because the presentation did not follow the requirements of EB Spec XXXX TPAC Qualification and Material requirements and included test results very similar to the Electric Boat sub-contractor's first article submission. With Jim Stern of the Chief Engineers Office and SUBE Department E12 Management Michelle Guilford and Rob Szukelewicz as witnesses, Scott Mader, Supervisor of Department E46 MIP/SHT Group stated they had no prior experience performing First Article Qualification testing for Newport News Shipbuilding.

59.    The relevant VCS DWG XXXX-XXXX MIP/SHT Manual specifications relating to the TPAC for special hull treatment procedures are summarized in Table III, *supra*. In addition, EB Spec TPAC Qualification and Material requirements applies to the use of the TPAC when used for Incompressible Wedge Manufacturing, which is summarized in Table V below.

<u>Table V – EB Spec XXXX – TPAC Incompressible Wedge Manufacturing</u>

| |
|---|
| First Article Testing and Qualifications |
| Process and Inspection Procedures/System IAW |
| MIL-I Recurring Quality Assurance Inspections |

### E.  Use of TPAC as Adhesive for Exterior Coating to Virginia-Class Submarines

60.    Although the utilization of the TPAC on the Chin Array was a new application of this product, Newport News Shipbuilding has also used the TPAC as an adhesive on the exterior hull of all of the Virginia-class submarines which they have delivered to the U.S. Navy as a means of bonding the exterior sound-absorbing material to the painted submarine hull. This is the same material discussed earlier which has exhibited in-situ failures within the TPAC adhesive and sloughing off the Virginia-class submarines since their inception.

61.    In  the  process  of  reviewing  VCS  DWG  XXXX-XXXXMIP/SHT  Manual specifications to determine if Departments E46 and X32 were applying the TPAC correctly to the Chin Array, Relator not only discovered that the Departments did not have proper qualifications for the application of the TPAC material to the Chin Array, but also discovered that the Newport News Shipbuilding MIP/SHT Group  also  failed to obtain qualifications for  applying the TPAC material as well as the MIP/SHT materials to  the painted exterior hull  of the  submarines. In other words,  the  Relator  discovered  that  under  VCS  DWG  XXXX-XXXX  MIP/SHT  Manual specifications, Newport News Shipbuilding was required to have undergone appropriate training and obtain applicable qualifications for the compliant application of   MIP/SHT hull coatings to a Virginia Class Submarine. Consequently, Relator discovered that Newport News Shipbuilding has improperly adhered TPAC and MIP/SHT to all of the exterior structure and painted hulls on   all of the Virginia-class submarines.

62.    This  discovery  of  improperly-adhered  exterior  coatings  occurred  at  the  same August 28, 2015 meeting addressing the Qualification Presentation submitted to Engineering by Scott Mader and Matt Shaffer of Department E46 on behalf of Department X32 to apply the TPAC to the Chin Array. Jim Stern of The Chief Engineer's Office aggressively pressed the Relator, in

front of the Relator's management, to accept the fraudulent presentation that was submitted and to grant Department E46/X32 approval and qualification to apply the TPAC. The Relator refused to accept the presentation and challenged Scott Mader on the content. As stated earlier, at this meeting, Scott Mader admitted that he, nor Dept. E46 had no prior experience with First Article Procedures, Testing, or Qualifications in his previous 20 plus years within the Newport News Shipbuilding MIP/SHT program.

63.     The Relator subsequently discovered that all Special Hull Treatment/Mold in Place (SHTMIP/SHT) materials require First Article Qualification prior to application on hull, approved material handling, application, and Quality Inspection Procedures, and an Applicator's Training and Certification Program. In addition, the original Specifications invoking these requirements initially developed for the Seawolf Program had Scott Mader's signature on the cover sheet. However, while under Scott Mader's cognizance, the entire Newport News Shipbuilding MIP/SHT Program was not qualified to perform this work in accordance with XXXX-XXXX (MIP/SHT Manual).

64.     Shortly after the August 28, 2015 meeting, the Relator was contacted by his counterpart at Electric Boat and asked why the Design Yard was advised by the Relator's management and E46 that the Relator was no longer "working" on the Chin Array and that any and all future discussions on the subject shall be with his management only. The Relator's Management then advised that based on Charles Southall's direction to relieve the Relator from all of his duties in E12 and report to the yard, Rob Szukelewicz and Michelle Guilford instead chose to relieve the relator from his HFCA duties pertaining to the boot installation only. This decision was not communicated to the Relator by his management, they just flew with Matt Shaffer to Electric Boat and told the VCS Design Yard in person. The Relator was advised that he would

no longer be interacting with E46 or the trades with respect to the chin array, however he was still required to maintain technical ownership of the system, support supply chain management through procurement of the system, support the suppliers involved with fabricating the HFCA components, and support the shipbuilder with installing the system on hull.

65.     Specifically, in accordance with Specification XXXX-XXXX MIP/SHT Manual, Newport News Shipbuilding is required to develop a first article testing procedure, produce sample test articles, perform mechanical and physical property tests on said samples, demonstrate TPAC processing ability, and receive First Article Qualification from the Technical Authority prior to commencing production work on Virginia Class Submarines. Newport News Shipbuilding is also required to develop and maintain a training program that ensures that all of its personnel are educated and certified to properly mix and apply the TPAC to the exterior of Virginia Class Submarines and adhere the exterior sound dampening material to the hulls of the submarines. Further, Newport News Shipbuilding is required to develop and maintain internal processing, handling, and Quality Inspection Procedures for all phases of TPAC, as well as MIP/SHT production work and application of the exterior sound dampening material to the hulls of the submarines. None of the aforesaid requirements as set forth by the Navy in accordance with XXX-XXXX MIP/SHT Manual have been met. In addition, neither Scott Mader, Matt Shaffer, nor Tom Osbourne were able to furnish documented evidence that any of these requirements have been met. Newport News Shipbuilding, however, has falsely certified in its payment applications that all MIP/SHT and TPAC has been applied in compliance with XXXX-XXXX MIP/SHT Manual.

66.     The TPAC, if utilized correctly, is highly effective, and upon information and belief, the exterior coatings of the Virginia-class submarines would not have failed if Newport

News Shipbuilding had followed the applicable specification standards during the application process.

67.     Newport News Shipbuilding Quality Audit and Assessment Department (K93) that oversees internal Quality Assurance (QA) was directed to investigate and audit the MIP/SHT group for compliance. K93 chose to exercise a "Pulse Audit" of the E46/X32 trades while they performed a TPAC pour for VCS. Matt Shaffer from Department E46 attempted to block K93 from accessing the MIP/SHT shop by claiming K93 does not hold the necessary "need to know" and OSHA requirements. After being advised that neither E46 or Trade Management have the authority to block QA from performing internal audits, K93 witnessed X32 prepare, mix, and pour the TPAC material. Within hours of witnessing the MIP/SHT/TPAC operations, K93 issued a Serious Deficiency Report (SDR) dated August 21, 2015 for Department E46/X32's failure to adhere to the invoked specifications for the application of TPAC and found that:

> While preparing for a comprehensive audit of TPAC MIP/SHT processes, K93 Audit and Assessment noted that there is no objective quality evidence that specification required first article testing requirements have been performed for TPAC MIP/SHT production processes. In addition K93 was unable to determine if there were NNS engineering prepared procedures in place. It was found that a specification required inspection procedure had not been created. As such, K93 cannot conduct an audit until engineering has worked through a Plan of Action and Milestones (POA&M) to assure compliance with specification and local procedural requirements.

68.     In addition to the SDR issued by Department K93, Mike O'Donnell, a Director at Newport News Shipbuilding, was also critical of Departments E46's and X32's ability to properly apply the TPAC. On August 27, 2015, Mike O'Donnell wrote an email to Matthew Holding, Thomas Osbourne, Willie Hayes, Scott Mader, John Zinskie, Ray Montgomery, Chandra McCulley-Hooker, and Dave Bolcar. In this email, Mr. O'Donnell indicated that:

> I consider the Mold-In-Place/Special Hull Treatment (SHT) (MIP/SHT) process as a current area of concern. This is not a hit on any one organization, it's simply based on the number of method B Corrective Action Requests (CARs) received in 2015, the progress of the investigations associated with the CARs and discussions with subject matter experts (including engineering, craftsmen, Electric Boat, and SUP SHIP NN), etc.
>
> My belief is that the customer (Navy) may be considering elevation to a method C or method D for this process. We have initiated our Area of Concern protocol and analyzed all CARs, Unplanned Events, QIMs, and Audits for the subject over the last two years to understand the scope and history of the problem, and are in the process of evaluating the causes and actions identified and taken to address the known issues.

69. Mr. O'Donnell works completely separate from the K93 QA group that had already issued a SDR for the MIP/SHT Program and Departments E46 and X32's work. Likewise, an elevation to method D by the Navy would constitute a very serious problem with construction. As a result, this email reflects that the United States Navy was dissatisfied about the work performed by the Newport News Shipbuilding MIP/SHT group. This confirms that two separate organizations at Newport News Shipbuilding had recognized that there were major defects in the work performed by Departments E46 and X32 related to the TPAC application in addition to the Relator's observations concerning same. Despite the multiple people to which the email was sent, no corrective action was taken by Newport News Shipbuilding.

70. On October 8, 2015, the Relator's personal cell phone was confiscated by Newport News Shipbuilding security. The Relator was advised by Amarita Kim in HR that the company believed the Relator to be a security threat because he had inadvertently left his cell phone in his personal car's center console while driving in the yard after hours to support the trades. The company held the cell phone for four weeks and found photographs of the discrepant TPAC material applied to the hull 677D Fairing Cap, which were taken at the sub-contractor's facility,

while the part was in plain sight to the general public, in Boston, MA during the process of removing the non-compliant TPAC. The Relator took the photographs and immediately forwarded them to Newport News Shipbuilding's E12 management, as well as the Design Yard, because foreign and uncured material was found on the now 4 month old TPAC boot that had been concealed by E46. During this discovery, despite saying prior that he personally installed and repaired this TPAC boot, as well as deemed it technically acceptable, Matt Shaffer told the Relator, other members of Dept. E12, and the Sub-contractor removing the TPAC that he was very disappointed in the quality of workmanship and performance of Department X32 trades who installed this deeply flawed and  unacceptable TPAC boot.

71.    HR had the photographs destroyed and the Relator was given a Final Written Warning and advised that he cannot seek another job within the company or be promoted for one (1) year. In addition, the Relator's exemplary performance ratings of 3's and 4's for 2015 were changed to a rating of 1, as directed by Amarita Kim. However, the Relators supervisor, Michelle Guilford, added in writing at the bottom of the performance rating that the Relator's performance remained exemplary and the overall score had only been changed by direction of Amarita Kim. In addition, department E12 could find no record or procedure stating this is a required result to receiving a written warning from HR. It was done at the personal discretion of Amarita Kim.  The Relator has never received such a low rating in 15 years at Newport News Shipbuilding. Ultimately, on or about October 29, 2017, the Relator was fired in direct retaliation for voicing multiple concerns, making valid complaints, and documenting non-conformances in good faith with respect to fraudulent conduct detailed herein.

72.    Upon further investigation, it became apparent to Relator and multiple others within SUBE that the continued failure of the exterior MIP/SHT coatings for submarines delivered by

Newport News Shipbuilding to the Navy, mimics the in-situ TPAC failures found on the FLTA, composite Sail Cusp, and HEI doors, and  is  a direct result of the failure of Newport News Shipbuilding to follow the proper processes, specifications, and requirements for the utilization of TPAC  material. .

73.     The quality problems associated with the exterior hull coatings and external structure's coatings continue to plague the Virginia Class Submarine Program. Photographs taken on April 15, 2019 and released by the Defense Visual Information Distribution Services (DVIDS) of a recently constructed Virginia class submarine shows extensive failures of the exterior hull coating system. The photographs show large sections of the MIP/SHT failures particularly in the stern sections of the boat.  This is the area of the boat where the MIP/SHT was applied by Newport News Shipbuilding. Contract numbers for the ships for which the TPAC was applied improperly to the hull are summarized in Table I.

74.     The failure of the exterior coatings on the Virginia-class submarines as a result of the improper application of TPAC results in inefficient performance of the submarines and loss of their sound absorbing exterior coating, thereby making the submarines easily detectable and placing them at risk during operations. Further, to the extent that the submarines can be detected by adversaries, it affects the strategic capabilities of the United States Navy, constitutes a risk to crew safety, and impacts the national security of the United States.

75.     Each Virginia-class submarine historically costs about $1.8 billion dollars to construct, which is charged to the Navy. In December of 2008, the Navy signed a $14 billion dollar contract with Huntington Ingalls predecessor (Northrup Grumman) and General Dynamics to construct eight submarines, which constitutes the Block III submarines covering hull numbers SSN-784 through SSN-791. This is a $14 billion multiyear procurement. Upon delivery of these

submarines by Huntington Ingalls to the Navy, Huntington Ingalls certified that the exterior coating material was properly adhered to the hull with the TPAC product, when clearly it was not.

## IV.  SEPARATE COUNTS

### COUNT I

### Scheme to Submit Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

76.     Count I is directed against all defendants - Huntington Ingalls Industries, Inc., Huntington Ingalls Incorporated d/b/a Newport News Shipbuilding, a Tenneco Company and Northrop Grumman Corporation.

77.     All allegations set forth in Paragraphs 1 through 8 and 10 through 75 of this Complaint are incorporated into this Count as if fully set forth herein.

78.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

79.     The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments that would otherwise not have been allowed or paid.

80.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $10,781 and up to $21,563 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT II

### Submission of Claims Containing False Express or Implied Certifications (31 U.S.C. § 3729(a)(1)(A))

81.     Count II is directed against all defendants - Huntington Ingalls Industries, Inc., Huntington Ingalls Incorporated d/b/a Newport News Shipbuilding, a Tenneco Company and Northrop Grumman Corporation.

82.     All allegations set forth in Paragraphs 1 through 8 and 10 through 75 of this Complaint are incorporated into this Count as if fully set forth herein.

83.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by defendant – material to false or fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(B).

84.     The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments that would otherwise not have been allowed or paid.

85.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $10,781 and up to $21,563 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT III

### False Claims Conspiracy (31 U.S.C. § 3729(a)(1)(C))

86.     Count III is directed against all defendants - Huntington Ingalls Industries, Inc., Huntington Ingalls Incorporated d/b/a Newport News Shipbuilding, a Tenneco Company and Northrop Grumman Corporation.

87.     All allegations set forth in Paragraphs 1 through 8 and 10 through 75 of this Complaint are incorporated into this Count as if fully set forth herein.

88.     By means of the acts described above, Defendants knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid by the United States.

89.     The United States, unaware of the falsity of the claims made by the Defendants, and in reliance on the material fraudulent or false representations within the claims, approved, paid, and participated in payments that would otherwise not have been allowed or paid.

90.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $10,781 and up to $21,563 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT IV

### Retaliation Against Relator, Ari Lawrence, by Huntington Ingalls, Inc. In Violation of 31 U.S.C. § 3730(h)

91.     Count IV is directed against only Huntington Ingalls Incorporated d/b/a Newport News Shipbuilding, a Tenneco Company.

92.     All allegations set forth in Paragraphs 1 through 8 and 10 through 75 of this Complaint are incorporated into this Count as if fully set forth herein.

93.     This is an action pursuant to 31 U.S.C. § 3730(h).

94.     By virtue of the activities described above, Relator Ari Lawrence has engaged in protected conduct under the False Claims Act.

95.     Defendant, Huntington Ingalls Industries, Inc., was aware of Relator Ari Lawrence's actions.

96.     Defendant, Huntington Ingalls Industries, Inc., discriminated against Relator Ari Lawrence from at least March 2015 through the present, in retaliation for his aforesaid conduct protected under the False Claims Act, as follows:

(a)     By blocking Relator's promotion from an E3 Senior Engineer to an E4 Project Engineer;

(b)     by relieving Relator from his duties as the System Expert with Technical Authority over the HF Chin Array and subsequently removing the entire system from his Area of Responsibility;

(c)     by threatening to relieve him of all of his duties within SUBE and transferring send him to the "yard" to work on his "engineering rigor";

(d)     by falsely reporting Relator as a security threat and confiscating his cell phone;

(e)     by changing his exemplary performance ratings of 3s and 4s for 2015 to a rating of 1, the lowest rating that Relator has ever received in the fifteen years he worked at Newport News Shipbuilding, all of which retaliation and discrimination was directed by Amarita Kim of NNS' HR department; and,

(f)     by terminating his employment on or about October 29, 2017 in retaliation for the complaints made in good faith by the Relator as described herein.

## DEMAND FOR RELIEF

WHEREFORE, Relator respectfully requests this Court enter judgment against Defendants as follows:

A.     That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false and fraudulent claims alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

B.      That civil penalties be imposed in the maximum amount for each and every false and fraudulent claim that Defendants presented to the United States;

C.      That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs and expenses which the Relators necessarily incurred in bringing and pursuing this action;

D.      That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

E.      That pursuant to § 3730(d), Relator be awarded the maximum percentage of the amount recovered by the United States as a result of this action;

F.      That Relator Ari Lawrence be awarded compensation for the retaliatory actions taken against him in violation of the § 3730(h) in the following amounts;

(a)      lost compensation based on the same seniority status as Relator would have had but for the retaliatory action;

(b)      two times the amount of back pay;

(c)      interest on the back pay;

(d)      compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees;

G.      That this Court award such other further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Relator, on behalf of himself and the United States, demands a jury trial on all claims alleged herein.

Respectfully submitted,

*/s/ John S. Vento*
John S. Vento, Esq. (FB No. 329381)
TRENAM LAW

101 E. Kennedy Boulevard, Suite 2700
Tampa, FL 33602
Telephone: 813-227-7483
Email: JVento@trenam.com

*/s/ James H. Shoemaker, Jr.*
James H. Shoemaker, Jr. (VSB No. 33148)
Scott L. Reichle (VSB No. 40016)
PATTEN, WORNOM, HATTEN &
DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: 757-223-4500
Facsimile: 757-249-1627
Email: jshoemaker@pwhd.com
Email: sreichle@pwhd.com
***Pro Hac Vice***

Kenneth R. Yoffy (VSB No. 20549)
C. Thomas Turbeville, Jr. (VSB No. 30641)
YOFFY & TURBEVILLE, PLC
4805 Courthouse Street
Williamsburg, Virginia 23188
Telephone: 757-259-0800
Email: kyoffy@mac.com
Email: tomtlaw@mac.com
***Pro Hac Vice***

***Counsel for the Relator***

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2019, a true and correct copy of the foregoing was served electronically by the Court's CM/ECF System September 4, 2019, on all counsel or parties of record.

By:     */s/ James H. Shoemaker, Jr.*
James H. Shoemaker, Jr. (VSB No. 33148)
PATTEN, WORNOM, HATTEN &
DIAMONSTEIN, L.C.
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Telephone: 757-223-4500
Facsimile: 757-249-1627
Email: jshoemaker@pwhd.com